Volume 1 of 4

**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KEVIN COOPER,
                    *Petitioner-Appellant,*

v.

JILL L. BROWN, Warden, California
State Prison at San Quentin,
                    *Respondent-Appellee.*

No. 05-99004

D.C. No.
CV-04-00656-H

OPINION

Appeal from the United States District Court
for the Southern District of California
Marilyn L. Huff, District Judge, Presiding

Argued and Submitted
January 9, 2007—San Francisco, California

Filed December 4, 2007

Before: Pamela Ann Rymer, M. Margaret McKeown, and
Ronald M. Gould, Circuit Judges.

Opinion by Judge Rymer;
Concurrence by Judge McKeown

15663

**COUNSEL**

Norman C. Hile and Ali Kazemi, Orrick, Herrington & Sutcliffe LLP, San Francisco, California, for the petitioner.

Holly D. Wilkens, Deputy Attorney General, State of California, San Diego, for the respondent.

**OPINION**

RYMER, Circuit Judge:

Kevin Cooper appeals the district court's denial of his third federal petition for a writ of habeas corpus. Sitting en banc, we held that Cooper made out a prima facie case that entitled him to file a second or successive application; authorized him to file it; and remanded for the district court to order that two tests be performed so that "the question of Mr. Cooper's innocence can be answered once and for all." *Cooper v. Woodford*, 358 F.3d 1117, 1124 (9th Cir. 2004). The two tests were a mitochondrial test of blond hairs found in one of the victim's hands, and a test for the presence of the preservative agent EDTA on a bloody T-shirt that was not part of the prosecution's case at trial but that Cooper specifically asked, on appeal, to have tested. On remand, the district court conducted

the mitochondrial DNA testing on the hairs and EDTA testing on the T-shirt. The results do not show Cooper's innocence. The court also held extensive evidentiary hearings at which forty-two witnesses testified with respect to all issues encompassed in Cooper's third application. In a 159-page ruling that comprehensively addresses each of the claims, then-Chief United States District Judge Marilyn L. Huff denied the petition on the merits and, alternatively, on the ground that Cooper's claims in the successive petition are procedurally barred. Order Denying Successive Petition for Writ of Habeas Corpus (May 27, 2005) (Order) (attached as Appendix A).

Cooper sought, and we provisionally granted, a Certificate of Appealability (COA) on whether the district court abused its discretion by denying discovery, necessary forensic testing, evidentiary hearings, and a request to expand the record; whether he is entitled to relief on his claims of actual innocence, that the state contaminated or tampered with key evidence, that the state failed to disclose material exculpatory evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and that Josh Ryen's testimony was unreliable; and whether he demonstrated multiple constitutional errors without which the jury would have returned a not guilty or noncapital verdict. We leave the COA in place, but we see no abuse of discretion in any respect and we agree with, and adopt, the district court's analysis on each of the claims.

Accordingly, we affirm.

I

Cooper was convicted of the first-degree murders of Franklyn Douglas Ryen, Peggy Ryen, his wife, Jessica Ryen, their 10-year old daughter, and Christopher Hughes, an 11-year old neighborhood friend of Joshua Ryen, the Ryen's 8-year old son who was brutally assaulted but lived. Following his conviction, Cooper was sentenced to death.

Cooper escaped from the California Institute for Men (CIM), a state prison, on Thursday, June 2, 1983, and hid out in a vacant house (the Lease house) next door to the Ryens' residence on Thursday night, all day Friday, and Friday night before the murders on Saturday night, June 4. Using a hatchet or axe and a knife that came from the Lease house, Cooper hacked to death Doug, who had 37 separate wounds, Peggy, who had 32 separate wounds, Jessica, who had 46 wounds that included carving on her chest, and Christopher, who had 26 wounds. Cooper inflicted chopping wounds to the head, and stabbing wounds to the throat, of Joshua. Christopher's father found the bodies late Sunday morning.

The facts are set out in meticulous detail in the district court's order. Order at 15703-32; 15796-810. Suffice it to summarize here that Cooper admitted staying in the Lease house; a blood-stained khaki green button identical to buttons on field jackets issued at the state prison from which Cooper escaped was found on the rug at the Lease house; tests revealed the presence of blood in the Leases' shower and bathroom sink; hair found in the bathroom sink was consistent with that of Jessica and Doug Ryen; a hatchet covered with dried blood and human hair that was found near the Ryens' home was missing from the Lease house, and the sheath for the hatchet was found in the bedroom where Cooper had stayed; Cooper's semen was found on a blanket in the closet of the Lease house; one drop of blood (A-41) that belongs to an African-American male, which Cooper is, was found on the wall of the Ryen hallway opposite where Jessica was found and post-trial DNA testing confirms that Cooper is the source of A-41; plant burrs found inside Jessica's nightgown were similar to burrs from vegetation between the Lease house and the Ryen house, and to burrs found on a blanket inside the closet where Cooper slept at the Lease house, and in the Ryen station wagon, which was missing when the bodies were discovered but turned up, abandoned, in Long Beach; two partial shoe prints and one nearly complete one found in or near the Ryens' house and in the Lease house

were consistent both with Cooper's shoe size and Pro-Keds Dude tennis shoes issued at CIM that Cooper did not deny having; a hand-rolled cigarette butt and "Role-Rite" tobacco provided to inmates at CIM was in the Ryens' vehicle, and similar tobacco was in the bedroom of the Lease house; and a hair fragment found in the Ryen station wagon was consistent with Cooper's pubic hair. Cooper checked into a hotel in Tijuana about 4 o'clock on Sunday afternoon.

The district court's order likewise recounts the procedural history from Cooper's February 19, 1985 conviction. Order at 15696-703. In sum: the judgment of conviction and sentence was affirmed by the California Supreme Court, which observed that the "sheer volume and consistency of the evidence is overwhelming," *People v. Cooper*, 53 Cal.3d 771, 837, 281 Cal.Rptr. 90, 129 (1991), and the United States Supreme Court denied a petition for certiorari, *Cooper v. California*, 502 U.S. 1016 (1991). Cooper's first federal petition, subsequently amended and supplemented, was filed August 11, 1994, and denied August 25, 1997; we affirmed, *Cooper v. Calderon*, 255 F.3d 1104 (9th Cir. 2001) (*Cooper I*); and his petition for a writ of certiorari was denied, 537 U.S. 861 (2002). Cooper filed a second federal petition on April 20, 1998, which we construed as an application for authorization to file a second or successive petition and denied. *Cooper v. Calderon*, 274 F.3d 1270 (9th Cir. 2001) (*Cooper II*). He sought to file another successor petition that involved DNA testing and tampering, which we denied, *Cooper v. Calderon*, No. 99-71430 (9th Cir. Feb. 14, 2003, April 7, 2003) (orders). Meanwhile, Cooper filed seven petitions in the California Supreme Court together with a writ of mandate and various motions, a habeas petition in the San Diego County Superior Court, and six other petitions for a writ of certiorari in the United States Supreme Court as well as two petitions for habeas corpus, each of which was denied. Cooper's February 2, 2004 petition to the California Supreme Court raised similar claims to those asserted in this application; that court denied all claims on the merits on February 5, 2004, and also

denied as untimely those having to do with evidence tampering, failure to disclose exculpatory evidence, submission of false testimony to the jury, and offering Joshua Ryen's unreliable testimony. On February 6, 2004, Cooper filed another application to file a successive application, which was initially denied, *Cooper v. Woodford*, 357 F.3d 1019 (9th Cir. 2004), *withdrawn*, 357 F.3d 1054 (Editor's Note Feb. 8, 2004), but was later granted after this court sua sponte decided to rehear the application en banc, *Cooper v. Woodford*, 357 F.3d 1054 (9th Cir. 2004). En banc, we authorized Cooper's third habeas petition to be filed, and stayed execution pending resolution of this application. *Cooper*, 358 F.3d at 1124 (*Cooper III*).

The district court denied the petition and denied Cooper's request for a COA. Judgment was entered on May 31, 2005. When Cooper then filed a request for a COA in this court, we allowed the appeal to go forward conditioned upon further consideration once briefing was completed. The state asks that we withdraw the COA, but we decline to do so. 28 U.S.C. § 2253(c); *Miller-El v. Cockrell*, 537 U.S. 322, 335-37 (2003). This means that Cooper has leave to assert that even though the district court allowed the testing that we ordered, it abused its discretion in how the tests were conducted and in the scope of the evidentiary hearings that it held; and to appeal denial of claims one through four (actual innocence, contamination or tampering with evidence, *Brady* violations, and unreliability of Joshua Ryen testimony), and six through nine (unlawful destruction of bloody coveralls, ineffective assistance of counsel for failing to present evidence of another person's confession, ineffective assistance of counsel in failing to connect the bloody coveralls to Lee Furrow, ineffective assistance of counsel in failing to introduce evidence that victims were clutching hair in their hands, and denial of constitutional rights by cumulative law enforcement errors and misconduct) of his third petition.

## II

Standards of review under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA) are well-known and are fully set out in the district court's order. *See* Order at 15732-40. However, the framework for analyzing an actual innocence "gateway" claim under *Schlup v. Delo*, 513 U.S. 298 (1995), remains unsettled. There is a question whether such a claim is governed by the *Schlup* standard itself, or by the AEDPA conditions for filing a second or successive application, 28 U.S.C. §§ 2244(b)(2)(B)(i) and (ii).[1] *Cf. House v. Bell*, 126 S.Ct. 2064, 2078 (analyzing a *first* habeas petition seeking consideration of defaulted claims based on a showing of actual innocence under *Schlup* rather than AEDPA). However, this need not detain us for Cooper fails to meet either standard.

Beyond this, a district court's decision to exclude expert testimony is reviewed for an abuse of discretion. *Stilwell v. Smith & Nephew, Inc.*, 482 F.3d 1187, 1191 (9th Cir. 2007). "The trial court has wide discretion in determining whether

---

[1]To make a successful claim under *Schlup*, "a petitioner must show that in light of all the evidence, including new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.' " *Carriger v. Stewart*, 132 F.3d 463, 478 (9th Cir. 1997) (en banc).

For authorization to file a second or successive application for habeas corpus under AEDPA, a petition must show that

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii)   the facts underlying the claim, if proven and viewed in light of the evidence a a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. §§ 2244(b)(2)(B)(i) and (ii). *See Cooper III*, 358 F.3d at 1119 (discussing the differences but finding it unnecessary to decide which standard applies).

particular scientific tests are reliable enough to permit expert testimony based upon their results." *United States v. Gillespie*, 852 F.2d 475, 480 (9th Cir. 1988) (citations omitted). The determination whether an expert witness has sufficient qualifications to testify is reviewed for an abuse of discretion. *United States v. Abonce-Barrera*, 257 F.3d 959, 964 (9th Cir. 2001).

We also review a district court's decision to permit or deny discovery in habeas proceedings for an abuse of discretion. *Bittaker v. Woodford*, 331 F.3d 715, 728 (9th Cir. 2003) (en banc). Such discovery is available only "for good cause."[2] *Hayes v. Woodford*, 301 F.3d 1054, 1065 n.6 (9th Cir. 2002). "We review for an abuse of discretion the district court's denial of an evidentiary hearing and the scope of an evidentiary hearing held." *Williams v. Woodford*, 384 F.3d 567, 586 (9th Cir. 2004).

## III

We first consider issues that relate to whether the district court abused its discretion as Cooper contends it did in denying discovery, failing to order forensic testing, limiting what he could show at evidentiary hearings, and refusing to expand the record on certain claims. Many of these issues are interwoven with the merits of claims one through four and six through nine, but Cooper raises discrete procedural challenges that we treat separately as best we can because, if the district court did not abuse its discretion in these procedural rulings, we agree with its other determinations. Necessarily there is overlap; to the extent there is, and reference to the district court's discussion on the merits is helpful to understanding its

---

[2]Rule 6(a) of the Rules Governing Section 2254 Cases provides:

> (a) A judge may, for good cause, authorize a party to conduct discovery under the Federal Rules of Civil Procedure and may limit the extent of discovery.

procedural rulings, we incorporate (without repeating) its analysis.

### A

Cooper complains that the district court denied the bulk of his discovery requests, but focuses on only three of them:[3] his request for photographs and documentation of the examination and testing of the bloodstained T-shirt, blood drop A-41, and the cigarette butts V-12 and V-17; San Bernardino Sheriffs Department (SBSD) files reviewed by Deputy Derek Pacifico after Cooper filed his third habeas petition as part of an investigation into whether CIM Warden Midge Carroll had or had not contacted SBSD before trial with *Brady* information regarding shoeprint evidence; and his request for test data of Dr. Gary Siuzdak, one of the EDTA testing experts selected by the court, when Siuzdak withdrew his results after discovering EDTA contamination in his laboratory. Cooper offers only a sketchy explanation why denying these requests, without prejudice, abused the court's discretion. We discern no basis for concluding that it did.

[1] The state produced materials relating to the post-conviction DNA testing in 2001 and these materials were also exhibits in the evidentiary hearing conducted by the district court. We cannot see how denying discovery as to these materials mattered at all.

[2] Warden Carroll's January 30, 2004 declaration stated that she had learned before trial — and had communicated to

---

[3]Cooper's briefing mentions other requests, *e.g.*, for discovery related to instructions to investigating authorities at the time of the murders to stop pursuing evidence pointing to someone other than Cooper, and of the notes of San Bernardino Sheriffs Department (SBSD) investigators who, after the third petition was filed, investigated employees and patrons of the Canyon Corral Bar on the night of the murders. However, he develops no argument with respect to them and we deem appeal as to these denials, and others, abandoned.

one of the lead detectives on the Cooper case — that the shoes CIM carried were not specially designed prison-issue shoes and were common shoes available to the general public through Sears and other such retail stores.[4] Because the en banc court was persuaded that a *Brady* violation appeared to be indicated, *see Cooper III*, 358 F.3d at 1120-21, the district court set an evidentiary hearing to address Cooper's claim that the prosecution failed to disclose Carroll's information. It heard testimony from Carroll; Lt. Donald Smith, a former investigator at CIM under Carroll; Don P. Luck, a former executive and sales manager for Stride Rite Corporation, the company that manufactured the Pro-Keds Dude tennis shoe; and Sandra Coke, the defense investigator who obtained declarations from Carroll, James Taylor, a CIM inmate who testified at trial that he gave Pro-Keds Dude tennis shoes to Cooper, and Detective Derek Pacifico of SBSD.[5] Carroll's files about Cooper's escape and the murder investigation were also in evidence. They are extremely detailed and include records of telephone conversations; however, they contain no indication that she spoke with the SBSD about tennis shoes worn by CIM inmates. In part for this reason, the court did not abuse its discretion in concluding that Cooper's request for all

---

[4]Although the district court cited a phone slip with the name of "Midge Carroll" dated 9/19/83 and two pages of notes from trial counsel David Negus's files, its determination does not depend upon proof that Negus knew about Carroll's investigation of the tennis shoes. There was, therefore, no need for Cooper to have been allowed to expand the record to correct this error, if any. For this reason, the court neither abused its discretion nor ignored the truth, as Cooper contends, in denying his Motion to Expand the Record Pursuant to Rule 7.

[5]Carroll was, of course, known to Cooper from day one. She had contact with defense investigators before and after trial. Carroll's availability to Cooper would not necessarily derogate the state's affirmative *Brady* obligation to disclose material exculpatory information that it knew about, but her accessability does highlight the lack of any meaningful connection between the breadth of Cooper's request and the possibility of adducing favorable, material information that would tend to exculpate him. It is unlikely that the SBSD would have thought itself capable of suppressing information that Carroll herself could easily have provided to Cooper.

SBSD files reviewed by Pacifico was unjustified by the possibility that Pacifico's review may have overlooked SBSD documents reflecting a communication that Carroll's own detailed files do not show. In addition, the prosecution's theory was not that Pro-Keds Dude shoes were limited to prison inmates (the Stride Rite records introduced at trial showed distribution to other government institutions), but that there was a link between the imprints found at and near the Ryen house and in the Lease house to Cooper, who never denied having a pair of Pro-Keds Dude shoes. Contracts from Stride Rite that were in evidence at trial show that CIM purchased 1,390 Pro-Keds Dude shoes. Carroll herself had no personal knowledge whatsoever about the availability of the tennis shoes at CIM or elsewhere. Thus, even if she had called SBSD as her declaration avers, all that she could have communicated was her *belief* that Pro-Keds Dude shoes weren't available at CIM but were available at places like Sears — which is both mistaken and immaterial. Consequently, her communication could not have had any appreciable bearing on a *Brady* claim. *Cf. Pham v. Terhune*, 400 F.3d 740, 743 (9th Cir. 2005) (noting that discovery under Rule 6(a) should not be denied if it is essential to develop fully a petitioner's claim).

Finally, the court acted within its discretion in denying access to Dr. Siuzdak's data. His EDTA test results did not reflect the expected results from the PBS buffer reagent blank control and so were unreliable. Contamination was not remarkable, as laboratories use EDTA in testing. As Suizdak's results were unreliable, they could not be used to prove Cooper's tampering claim.

## B

Cooper contends that the district court's testing protocol for the bloody T-shirt was flawed in five respects: (1) while the court facially complied with the en banc order allowing only Cooper to select a stain from the T-shirt for limited anti-

clotting agent testing, it refused to allow presumptive blood testing to determine whether the stain tested was even a blood stain; (2) it did not allow his experts, Dr. Peter DeForest and Dr. Kevin Ballard, to view the T-shirt as a first step in designing the protocol; (3) it accepted at face value Dr. Gary Siuzdak's retraction of his EDTA testing results; (4) it denied testing for anti-clotting agent migration; and (5) it denied testing for other anti-clotting agents such as citric acid that were used to preserve Cooper's blood. He also maintains that while the district court facially complied with this court's order to perform mitochondrial DNA testing to determine whether hairs at the crime scene belonged to a third party perpetrator, the testing ignored the recommendation of Dr. Edward Blake to evaluate unexamined groups of hair. As a result, Cooper submits, a large group of hairs was never examined for anagen roots (roots that indicate the hair was pulled instead of having been cut or broken), and thus hairs in that group were never considered for testing. He also argues that the Cooper DNA against which the hairs were examined was contaminated and therefore could not prove that he was a possible source of the hairs. We disagree that the district court abused its discretion in conducting either test.

**[3]** The district court held a tutorial on mitochondrial DNA and EDTA testing at which experts for Cooper and the state testified. At the tutorial, Cooper's expert, Dr. Terry Melton, explained that mitochondrial testing cannot be used effectively to identify the source of hairs, but rather is primarily an exclusionary method as it determines only whether a hair shares maternal DNA with a particular individual. The court developed a protocol and ordered that ten hairs suitable for testing from Jessica's hands be tested for mitochondrial DNA and that two hairs (one found on Doug Ryen's hand and one on Chris Hughes's arm) identified in 2001 as having anagen roots also be tested. Dr. DeForest, Cooper's criminalist, selected the hairs. Two proved to be animal hairs, and tests on the remaining hairs could not exclude Jessica, Peggy, Josh or their maternal relatives as donors. Therefore, the results of

mitochondrial DNA tests did not indicate that these hairs were pulled out of the head of a third party perpetrator.

With respect to testing the T-shirt for the purpose of determining whether the blood, previously associated with Cooper's DNA, had been planted, the district court developed the EDTA protocol over a three-month period and after extensive input from counsel and the experts. Upon the parties' recommendation, the court also adopted a "control" method of testing in which the amount of EDTA detected in a stain would be compared to the amounts of EDTA found in various control swatches and from other non-stained portions of the T-shirt. Pursuant to the protocol, the stain was to be extracted by Dr. DeForest and shipped to Dr. Ballard and Dr. Suizdak for double-blind EDTA testing. After the test results were submitted, the parties proposed a protocol for DNA testing to determine whether the main stain fabric cut-out from the EDTA testing contained Cooper's blood. From the results of that testing, Cooper could not be excluded as a contributor of the DNA extracted from the cut-out, while Peggy Ryen, Jessica Ryen, Josh Ryen, Doug Ryen and Chris Hughes were each eliminated as a possible contributor. The court ultimately concluded that EDTA testing lacks sufficient indicia of reliability to be admissible under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993). However, the court alternatively found that Dr. Ballard's results disprove Cooper's theory of tampering because Cooper's theory requires a high level of EDTA presence in the blood, but the EDTA level in the stain with blood was actually lower than that of most of the control areas. *See* Order at 15760-89 (describing process and making EDTA findings).

[4] Turning to Cooper's contentions about testing of the T-shirt, we note at the outset that it is immaterial whether the EDTA tests were flawed or not because the district court had discretion to conclude that EDTA testing does not meet *Daubert* standards. "In *Daubert*, the Court set out four factors to be reviewed when applying Rule 702: (1) whether the theory

or technique can be or has been tested, (2) whether the theory or technique has been subjected to peer review, (3) whether the error rate is known and standards exist controlling the operation of the technique, and (4) whether the theory or technique has gained general acceptance."[6] *United States v. Benavidez-Benavidez*, 217 F.3d 720, 724 (9th Cir. 2000). There is no evidence in the record that application of mass spectrometry to forensic analysis of blood evidence to determine EDTA levels can be or has been tested. The technique has been offered to courts only twice before; in one case, there was no challenge to the EDTA evidence and in the other, Dr. Ballard, as well as the EDTA testing that he was to perform, were rejected by the court. EDTA testing has not been subjected to peer review and there has been no discussion of forensic EDTA testing in scientific literature since a 1997 article that headlines the need for a better analytical method. In short, for reasons explained in detail by the district court, Order at 15774-85, EDTA testing has not gained general acceptance in the scientific community.

[5] Regardless, Cooper fails to explain why additional inspection of the T-shirt was necessary, for an appropriate stain and controls were selected after 6G, the stain that was initially selected, proved unavailable because it had already been consumed. Dr. DeForest did not participate in this selection because he had removed himself, but Cellmark — a laboratory that Cooper agreed was highly qualified — replaced

---

[6]Federal Rule of Evidence 702 governs admissibility of scientific evidence in federal district court. *Clausen v. M/V NEW CARISSA*, 339 F.3d 1049, 1055 (9th Cir. 2003). It provides:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

him to conduct the extraction. No basis appears in the record to question selection of the stain that was used, and Cooper points to none on appeal. Dr. Maddox of Cellmark and the state's expert, Steven Myers, selected an area between two stains designated "6J" and "6K," each of which had earlier been found to be blood containing primarily Cooper's DNA.

Nor does any reason appear why Dr. Suizdak's representations should not have been accepted at face value; the testing he was to undertake was double-blind, he is a well respected scientist, and he had no interest in the outcome.

**[6]** Cooper never asked for presumptive blood testing before the protocol was implemented, which is sufficient reason to reject his argument on appeal; in any event, as DNA analysis on the tested area later confirmed that Cooper could not be excluded as a contributor of the DNA extracted from the cut-out, there is no point to his complaining now about the lack of presumptive testing. Likewise, Cooper articulated no concern before the test results were in about the possibility that EDTA could have migrated from the selected stain. Regardless, if his post-hoc migration theory were correct, it would be theoretically impossible to achieve meaningful results from further testing as there is no way to determine whether the background EDTA levels throughout the shirt are higher than normal for there is no "normal" base level of EDTA.

**[7]** Finally, Cooper's suggestion that testing for *other* anti-clotting agents such as citric acid should have been allowed is misplaced as the only occasion where his blood was preserved in a tube containing citric acid was when it was drawn by the San Quentin Prison, not by the SBSD, and the only blood sample of Cooper's to which the SBSD had access was drawn into a tube containing EDTA as a preservative. Further testing on the T-shirt was, therefore, not required.

**[8]** Neither was the mitochondrial DNA testing deficient as Cooper argues. By way of background, Cooper's forensic

expert (Dr. Blake) and Department of Justice criminalist Steven Myers spent six days in 2001 jointly conducting visual and microscopic examination of approximately 1000 hairs recovered from the victims' bodies in order to identify hairs that had properties of hair pulled from the skin. Only hairs with anagen roots can be used to identify an assailant because only they, as contrasted with a cut or broken hair, can indicate that the victim may have pulled the perpetrator's hair in a struggle. Three hairs meeting the experts' criteria were identified, but nuclear DNA testing of these hairs yielded no human DNA. Responsive to the en banc ruling, the district court allowed Cooper's criminalist to select up to 10 hairs from those removed from Jessica's hands for mitochondrial DNA testing. No anagen hairs were identified and the 10 hairs selected were tested along with the two remaining hairs subjected to nuclear DNA testing in 2001. The results show that Jessica, Peggy, and Josh Ryen could not be excluded as the source of the hairs in Jessica's hands.

Cooper contends that the court turned its back on its "own expert's" view that hair testing must be designed to ensure that it is complete and thorough, but the premise is faulty on two accounts. First, the expert referred to — Dr. Blake — was not the court's expert, as Cooper characterizes him; he was *Cooper*'s expert in state court and has been throughout the federal proceedings, and did not become otherwise solely on account of his appointment by the court for the purpose of assuring adequate compensation. More importantly, Dr. Blake did not recommend that *every* hair be examined, as Cooper suggests. To the contrary, Blake testified that "[t]he only reason to go through this process one more time is simply to be much more rigorous and detailed in the survey, should that be deemed to be a useful thing to do." He never opined that it *would be* useful or reasonable.

**[9]** Cooper's argument that his blood sample was contaminated is beside the point. The hairs were never examined to see if they came from *Cooper*, and there has never been any

evidence or suggestion to that effect. Rather, Cooper's theory was that the hairs came from *a third party*, that is, from the real killer, and if this could be shown, then the presence of a third party at the scene would prove his innocence. That is why the en banc court ordered mitochondrial testing. *See* 358 F.3d at 1124 (noting that mitochondrial testing of the blond or light brown hair in Jessica Ryen's hand, if favorable to Cooper, could positively identify Lee Furrow or perhaps others as the killer or killers). Thus, even if Cooper's sample were contaminated, it is irrelevant.

## C

**[10]** Cooper maintains that the district court refused to allow him to present evidence related to the three suspicious men in the Canyon Corral Bar. This is belied by the record. *See* Order at 15811-23. He points to exclusion of Al Warren, a bartender who was not present on the night of the murders, for whom his only proffer was that Warren was "presumably" privy to discussion of the incident. Having heard from the bartender who was on duty (Edward Lelko), the manager, the waitress who served the three men drinks, two patrons who saw the three men, another waitress who was working that night, a bouncer, and others who frequented the Canyon Corral, the court had discretion to decline to hear another bar employee who was not percipient. Cooper also points to limited inquiry into witness tampering with Lance Stark. Stark testified that before the evidentiary hearing, he was approached by an individual wearing a white, short sleeve shirt and driving a white, unmarked Ford Crown Victoria with a computer extending out from the dashboard on an arm, whom he believed to be a member of law enforcement and who made it clear that it would be in Stark's best interest not to talk about the Cooper case. However, the court had discretion to find that Cooper's request for further inquiry would be a wild goose chase as Cooper had no license plate or other information that might lead to the driver, and to conclude that it would be unlikely to produce anything of probative value.

Stark testified, so the incident did not inhibit him and even if it were law-enforcement related as he speculates, it would have no tendency to prove what happened at the Canyon Corral Bar.

[11] Cooper also submits that the court improperly refused to allow him to examine Daniel Gregonis, the SBSD criminalist responsible for examining and testing several items of evidence including the bloodstained T-shirt, blood drop A-41, and the cigarette butts V-12 and V-17. However, Cooper was given an evidentiary hearing in state court in 2003 to present evidence of his tampering claims, and Gregonis testified and was examined by Cooper's counsel. He had an opportunity to develop a record, and the district court was not obliged to provide another one.

The same is true to the extent Cooper contends that further testing is needed in general to show that these items, blood spots identified as the "UU Series," and a blood sample drawn from him at the time of his arrest (VV-2) were tampered with. Each claim is procedurally barred and, in addition, both the tampering with the UU Series claim and the planting of cigarette butts claim have been previously adjudicated. *See, e.g., Cooper v. Calderon*, No. 92-CV-427H at 41, 50-51. As we have explained, it doesn't matter to any of Cooper's claims whether his blood sample (VV-2) was contaminated or not; it wasn't used for anything material.

Cooper also insists that the fact that the size of one of the cigarettes (V-12) changed by 3 millimeters after having been unrolled for testing demonstrates tampering, but his position was rejected by the San Diego County Superior Court after an evidentiary hearing and Cooper has not overcome the deference due that determination under 28 U.S.C. § 2254(d). The first measurement (4 mm) was of a "butt," whereas the second measurement (7 mm) is one of two dimensions given for "burned paper in box 7x7 mm." It is clear that the second measurement is of *unrolled paper*, whereas the first measure-

ment is of the *rolled butt*. That the dimensions would be different is self-evident, and the difference in no way calls into question the state court's finding or requires further inquiry at this stage.

**[12]** Cooper continues to assert that the bloody T-shirt is connected to at least one of the perpetrators and that the district court limited the evidence he was allowed to develop and present to show tampering. This goes nowhere for reasons we have just explained. Nor did the district court abuse its discretion in not allowing Cooper to recall Dr. Ballard to clarify the reliability of his testing methods, to state that he could test for other anti-clotting agents, and to testify to the reliability of his laboratory; or to cross-examine experts with respect to anti-clotting agent testing; or to cross-examine Dr. Suizdak and Dr. Lewis Maddox, who prepared the stain solutions for testing. To the extent relevant and helpful, ample opportunity for expert input and consultation was afforded.

**[13]** Cooper also faults the district court for refusing to permit him to pursue examination of informant Albert Anthony Ruiz, who testified at an evidentiary hearing on August 6, 2004, about what he might have heard from sources other than law enforcement in San Bernardino County. The asserted relevance was to Cooper's *Brady* claim that the prosecution failed to disclose evidence from Ruiz that law enforcement was ordered to plant evidence inculpating Cooper. We see no abuse of discretion, as Ruiz did not work for and had no dealings with SBSD and had no direct information about the investigation. All that he could possibly have learned was secondhand public information recounted by Jim Parsons, a deputy with the Riverside County Sheriff's Department who submitted a declaration himself and who, in any event, had no involvement in the Cooper case or knowledge of it beyond what he read in the papers or saw on television. In light of this, the court committed no error in excluding information that was hearsay and speculation as well as immaterial to SBSD's *Brady* obligations.

**[14]** Cooper's contention that the district court improperly refused to allow him to uncover and present evidence regarding daily logs and a blue shirt listed on the log for June 6, 1983, fails as no evidence contradicts the state's submission that the log was available to Cooper before trial. Cooper's counsel represented to the trial judge that he had the daily logs. The issue could, and should, have been pursued long before now. *See* Order at 14869-74.

**[15]** Cooper argues that he was precluded from fully exploring his tennis shoe claims by the court's refusal to allow him to review the records Pacifico reviewed and to send written questions to Michael Newberry, who worked for Stride Rite Corporation and testified at trial that Stride Rite had a contract with CIM for Pro-Keds Dude tennis shoes that were not available in retail stores. We have already explained why the court did not abuse its discretion in declining to order discovery into all the SBSD files reviewed by Pacifico, and Cooper makes no proffer why questions to Newberry would shed any light on the contracts which were, themselves, in evidence, or on distribution of the Pro-Keds Dude shoe as to which there is no substantial dispute — except for Carroll's unfounded belief.

**[16]** Cooper also complains that he was not allowed to cross-examine Josh Ryen in connection with Claim Four, which asserts that Josh's testimony at trial was altered and unreliable. As the district court found, the facts and circumstances surrounding Josh Ryen's statements and how they were presented to the jury have been known for twenty years. The jury heard two taped statements pursuant to the parties' stipulation: a videotape of an interview on December 9, 1984 when Cooper's counsel and the prosecutor questioned Josh under oath, and an audiotape of a December 1, 1983 interview with Dr. Lorna Forbes, Josh's treating psychiatrist. He did not identify an assailant in either one, but said on the one hand that three Hispanic workers visited the ranch the day of the murders, and on the other that he saw a single man with a

"puff" of hair standing over his mother. On April 22, 2005, the district court allowed Josh Ryen, along with Christopher Hughes's parents, to make a statement about their views of the matter as victims.[7] Cooper argues that he should have been allowed an evidentiary hearing because the April 22, 2005 statement (during which Josh Ryen recalled a man with "bushy" hair) was a "third version" that further proves the manipulation, and unreliability, of the trial version. We disagree that the court abused its discretion.[8] Even accepting Cooper's position that Josh Ryen's April 22, 2005 statement satisfies the requirements for an evidentiary hearing in § 2254(e)(2) because the latest version could not have been discovered earlier, § 2254(e)(2)(B)[9] nevertheless applies to bar relief as the jury knew that Josh Ryen had given somewhat inconsistent accounts yet convicted Cooper anyway. We

---

[7]This was after the close of evidence. The district court allowed Hughes and Josh Ryen an opportunity to make a statement consistent with Congress's intent in The Justice For All Act, Pub. L. No. 108-405, § 102, 118 Stat. 2260, 2261-62 (2004), that victims be heard.

[8]Aside from noting that the jury never heard Josh's recollection of a man with bushy hair, the district court did not base its Claim Four determination on anything that Josh said in his victim statement. Rather, it found that the defense was benefitted at trial by the taped presentations because Josh Ryen did not identify his assailant, the jury heard his earlier statement that three Hispanic workers had been at the ranch, and the stipulation avoided the sympathy factor of having Josh present on the stand. It concluded that deference was due to the state court's determinations and, as Cooper has known about Josh's somewhat inconsistent versions since the murder, he failed to exercise due diligence in developing the factual predicate for a new evidentiary hearing. *See* Order at 14878-79; 28 U.S.C. § 2254(e)(2).

[9]In relevant part, 28 U.S.C. § 2254(e)(2)(B) provides that an evidentiary hearing shall not be held on a claim unless it relies on a factual predicate that could not have been previously discovered through the exercise of due diligence, and

> (B) the facts underlying the claim would be sufficient to establish by clear and convincing evidence that but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

cannot conclude that no reasonable juror would have convicted Cooper knowing that Josh Ryen now recalls a man with bushy hair.

Finally, Cooper maintains that the district court purported to make credibility determinations of witnesses based solely on documents. Even if this weren't allowed (which it is, in appropriate circumstances), he points to no instances where this happened.

[17] Accordingly, there is no basis to remand for examination and more testing of the evidence, or additional evidentiary hearings, as Cooper urges.

IV

The district court denied Cooper's claim of actual innocence after detailing the DNA evidence that shows he is the donor of the DNA extracted from the drop of blood found in the hallway outside the Ryen master bedroom (A-41), saliva from the hand-rolled and manufactured cigarette butts (as used at CIM) found inside the abandoned Ryen station wagon, and blood smears on the T-shirt found near the Canyon Corral Bar (even though it was not used to establish Cooper's guilt at trial); explaining why Cooper's challenge to the DNA evidence is unavailing; reviewing prior court findings that document overwhelming evidence of guilt; and considering the testimony from forty-two witnesses and numerous exhibits introduced at evidentiary hearings held after remand. Order at 15789-853.

Cooper argues the district court was incorrect in light of substantial evidence of third party perpetrators in the Canyon Corral Bar and Albert Anthony Ruiz's testimony. That he didn't do it, Cooper suggests, is bolstered by his showing of alternative suspects through the Kenneth Koon confession and information concerning Lee Furrow and his bloody coveralls.

We disagree, for reasons stated by the district court. *See* Order at 15846-47; 15850-51.

[18] We agree with the district court's conclusion that all of Cooper's challenges "have come back the same: there is overwhelming evidence that Petitioner is the person guilty of these murders." Order at 15854. Considering all the evidence, new and old, Cooper has not shown that it is more likely than not that no reasonable juror would have found him guilty beyond a reasonable doubt. *Schlup*, 513 U.S. at 327; *see House*, 1265 S.Ct. at 2076-78 (explaining the *Schlup* standard). Thus, Cooper meets neither *Schlup*'s gateway nor AEDPA's.[10] It follows that Cooper has not met *Herrera*'s standard for actual innocence. *Herrera v. Collins*, 506 U.S. 390 (1993).

V

[19] In discussing Cooper's procedural challenges, we have already indicated why he is not entitled to relief on his claim that the state contaminated or tampered with the evidence with respect to examination and testing of the T-shirt and the blood spot (A-41). The T-shirt, of course, was not used as evidence against Cooper so it is difficult to see how it could have had any inculpatory effect. Post-conviction, however, it has become the center of attention. *See, e.g., Cooper III*, 358 F.3d at 1124 (observing that this case centers on Cooper's claim that he is innocent, and quoting his argument that with EDTA testing " 'the question of Mr. Cooper's innocence can be

---

[10]In addition to finding that most of Cooper's allegations relate to evidence that was already presented at trial and previously rejected, and that the remainder rest on unreliable or incorrect information and source, the court concluded that Cooper did not meet his burden under 28 U.S.C. § 2244(b), which requires a factual claim not discoverable through due diligence that establishes by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found him guilty, or under § 2254(d), which requires that the state court's decision be contrary to or an unreasonable application of clearly established federal law.

answered once and for all' "); *id.* (Silverman, CJ, concurring in part and dissenting in part) (noting that "[e]verything comes down to the bloody t-shirt"). The San Diego County Superior Court took evidence on the tampering claim and found none, and the California Supreme Court denied Cooper's petition for writ of mandate on the issue. EDTA testing turned up nothing to indicate tampering.

There was neither visible blood remaining on the paint chips comprising A-41 nor control areas around the blood sample for purposes of determining if there is a significant difference between the amounts of EDTA in the stain compared with areas surrounding it. Accordingly, for reasons it explained that are well-founded in the record, the district court concluded that A-41 is not able to be reliably tested for the presence of EDTA. Order at 15786-89. This leaves in place the finding of the state court that no tampering occurred. Cooper offers no convincing evidence why that finding is not correct and entitled to deference.

**[20]** To the extent his appeal extends beyond these items, we also agree with the district court's analysis that Cooper's claims of evidence tampering and withholding lack merit. *See* Order at 15874-78.

VI

**[21]** Cooper argues that the district court's analysis of his *Brady* claims was contrary to clearly established federal law as set forth in *Kyles v. Whitley*, 514 U.S. 419, 435-36 & n. 10 (1995), in that it analyzed each *Brady* claim individually without analyzing their cumulative effect. We agree with the district court's analysis with regard to the state's alleged withholding and manipulation of evidence related to shoeprints found in the Ryen home and hideout house, the bloody coveralls, the blue shirt, and the Canyon Corral Bar. As there is no individual *Brady* violation, there are no violations to cumulate.

**[22]** Apart from what we have already discussed, the district court held an evidentiary hearing to evaluate Cooper's claim that he discovered in 1998 a disposition report initialed "KS" that contradicted Deputy Frederick Eckley's trial testimony that on his own, he had destroyed the coveralls that Diana Roper gave him. After considering the testimony of Eckley and Deputy Ken Schreckengost (the "KS" of "KS") and evaluating their credibility, the court found that Eckley did act on his own in destroying the coveralls without discussing it with Schreckengost. So, as the district court held, the disposition report does not cast doubt on Eckley's testimony or undermine the prior findings and conclusions of the California Supreme Court or the district court's own determination that the coveralls were not material exculpatory evidence in Cooper's case. Order at 15857-59. We are not firmly convinced this finding is wrong.

**[23]** The district court rejected Cooper's contention that the prosecution failed to disclose that a police officer was present at the Canyon Corral Bar on the night of the murders based on extensive testimony about what actually happened that night and what it viewed as the more credible version of those events. Cooper's argument on appeal is insubstantial and leaves us without a firm conviction that the district court erred. As there was no police presence at the bar on the night of the murders, there was no evidence for the prosecution to suppress.

**[24]** Cooper additionally alludes to the fact that Detective Timothy Wilson had information that three suspicious men were seen in the bar, which he passed on to the sergeant in charge of the Ryen/Hughes investigation but which the prosecution failed to disclose to Cooper. However, Cooper offers no suggestion why this information undermines confidence in the verdict. It was no secret that three strangers were at the bar. The district court found that the more credible version of events came from employees and patrons interviewed shortly after the murders who testified at trial. In any event, none of

the witnesses casts doubt on the physical evidence of Cooper's guilt. As the court's exhaustive recital of all the Canyon Corral evidence — both that adduced at trial and at the evidentiary hearing — shows, *see* Order at 15811-24, rumors that Wilson picked up from word on the streets could not have been exculpatory, impeaching or material.

## VII

**[25]** The district court noted that the jury heard two taped statements of Joshua Ryen, pursuant to stipulation, that benefitted the defense because he did not identify his assailant, had earlier indicated that three Hispanic workers had been at the ranch, and was not on the stand to garner sympathy. The court deferred to denial of Cooper's constitutional claim on the merits by the California Supreme Court pursuant to 28 U.S.C. § 2254(d), and found that Cooper had not demonstrated that, but for constitutional error, no reasonable juror would have found him guilty if Josh Ryen had been subjected to testifying at trial. Order at 15878-80. We agree.

## VIII

Cooper's initial briefing posits that he is entitled to relief on his claim that SBSD unlawfully destroyed the bloody coveralls, and on his claims that trial counsel rendered ineffective assistance in failing to present evidence of another person's confession to the murders, failing to connect the bloody coveralls to Lee Furrow, and failing to introduce evidence that victims were clutching hair in their hands. He pursues none of these claims in reply. Each has been adjudicated previously in one forum or another. And we are in accord with the district court's treatment of all these claims. *See* Order at 15846-53.

## IX

**[26]** Our conclusion that Cooper prevails on none of his claims moots his last submission, that his conviction and sen-

tence were infected by multiple constitutional errors without which the jury would have returned a not guilty or non-capital verdict. As the district court, and all state courts, have repeatedly found, evidence of Cooper's guilt was overwhelming. The tests that he asked for to show his innocence "once and for all" show nothing of the sort.

AFFIRMED.

APPENDIX A

Order Denying Successive Petition for Writ of Habeas
Corpus (May 27, 2005)

United States District Court

Southern District of California

McKEOWN, Circuit Judge, concurring:

## I.

I concur in the opinion but am troubled that we cannot, in Kevin Cooper's words, resolve the question of his guilt "once and for all." I do not fault the careful and extensive review by the district court or the multiple levels of appeal carried out under statutory and Supreme Court standards. Rather, the state bears considerable responsibility in making such resolution unavailable. I separately concur to underscore the critical link between confidence in our justice system and integrity of the evidence.

Significant evidence bearing on Cooper's culpability has been lost, destroyed or left unpursued, including, for example, blood-covered coveralls belonging to a potential suspect who was a convicted murderer, and a bloody t-shirt, discovered alongside the road near the crime scene. The managing criminologist in charge of the evidence used to establish Cooper's guilt at trial was, as it turns out, a heroin addict, and was fired for stealing drugs seized by the police. Countless other alleged problems with the handling and disclosure of evidence and the integrity of the forensic testing and investigation undermine confidence in the evidence. As the Supreme Court observed in *Kyles v. Whitley*, "[w]hen, for example, the probative force of evidence depends on the circumstances in which it was obtained and those circumstances raise a possibility of fraud, indications of conscientious police work will enhance probative force and slovenly work will diminish it." 514 U.S. 419, 446 n.15 (1995).

The legitimacy of our criminal justice system depends on the "special role played by the American prosecutor in the search for truth in criminal trials." *Banks v. Dretke*, 540 U.S. 668, 696 (2004) (quoting *Strickler v. Greene*, 527 U.S. 263, 281 (1999)). The same principle extends to the police and their investigatory work in supporting the prosecution. Of

course we don't demand or expect perfection. But we expect full disclosure, competency in the investigation, and confidence in the evidence. To be sure, sometimes the prosecution is hampered by sloppy police work. And sometimes inept investigation and disclosure by the police colors the prosecution. But, the obligation of the prosecutor to disclose evidence favorable to the defense serves to "justify trust in the prosecutor as 'the representative . . . of a sovereignty . . . whose interest . . . in a criminal prosecution is not that it shall win a case, but that justice shall be done." *Kyles*, 514 U.S. at 439 (quoting *Berger v. United States*, 295 U.S. 78, 88 (1935)).

Despite the presence of serious questions as to the integrity of the investigation and evidence supporting the conviction, we are constrained by the requirements of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), 28 U.S.C. § 2244(b)(2)(b). The only exception potentially applicable in Cooper's case requires Cooper to present facts that "could not have been discovered previously through the exercise of due diligence," and that, if proven, and "viewed in light of the evidence as a whole, would be sufficient to establish by *clear and convincing evidence* that, but for constitutional error, *no reasonable factfinder* would have found [Cooper] guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B) (emphases added).

In light of this demanding statutory barrier, I agree that Cooper has failed to qualify for relief. Nonetheless, I write separately to draw attention to the illustrative troubling circumstances involving the alleged state mishandling of evidence. The forensic evidence in this case is critical and yet was compromised.[1] These facts are all the more troubling because Cooper's life is at stake.

---

[1]Other evidence, such as the eye witness testimony, was wide-ranging and contradictory. For example, following the murders, Josh initially signaled that three men were his attackers. He also signaled that they were not black or dark-skinned. Later, he saw Cooper on television and said that Cooper was not the attacker and that he had never seen Cooper, an observation he also shared with his grandmother. A year and a half later, Josh testified that Cooper had done the killing.

## II.

Following are illustrative examples of evidentiary gaps, mishandling of evidence and suspicious circumstances.

### DESTRUCTION OF BLOODY COVERALLS

During the pre-trial investigation, a woman named Diana Roper phoned police to report a pair of bloody coveralls left at her house by her then-boyfriend, Lee Furrow. Roper told police that Furrow may have been involved in the Ryen-Hughes murders. Furrow's hatchet was missing from his tool belt after the murders, and Roper also reported erratic behavior and remarks that aroused her suspicion.

According to Roper and her sister, on the day after the murders, Furrow showed up in a car that matched the description of the Ryens' station wagon. Roper also explained that Furrow bragged about his three rules "to follow anytime you do a crime:" "wear gloves, never wear your own shoes and never leave a witness alive."

In the face of this potential link between Furrow and the murders, and despite being a convicted murderer, Furrow was never pursued as a suspect. *See, e.g.*, *Allen v. Woodford*, 395 F.3d 979, 986 (9th Cir. 2005) ("When Furrow and Kitts were finally left alone, Furrow began to strangle Kitts, only to be interrupted by a phone call . . . . Furrow then strangled Kitts to death . . . tie[d] stones to Kitt's wrapped-up body and . . . [threw] it into a canal.").

The coveralls were turned over to a detective, but case investigators did not follow up. The homicide division did not return phone calls. Then, before completion of the preliminary hearing, the detective threw the coveralls away in a dumpster. Although the destruction of the coveralls was known at trial and was pursued during Cooper's first federal habeas petition, the destruction of evidence was claimed to be the misguided

act of a single officer. Only later, long after the trial, did the defense discover previously undisclosed documentary evidence to the contrary—a police department memorandum confirming destruction of the coveralls, signed by a higher ranking supervisory officer. Destruction of bloody coveralls from a potential suspect is not an inconsequential forensic gaffe.

## THE MISSING SHIRT

Although two suspicious and potentially bloodied t-shirts were apparently turned over to the police and logged in as evidence during the murder investigation, only one of these—a yellow t- shirt—was disclosed to the defense. However, the police logged in a second, possibly blood-covered shirt and recorded it as a *blue* shirt. The blue shirt was not produced to the defense and reference to the shirt was only found when, post-conviction, defense counsel was combing through later-discovered police logs.

In yet another investigative contradiction, the state now claims that the blue t-shirt was actually the yellow t-shirt that was properly disclosed. However, the woman who found the shirt on the side of the road not far from the crime scene and who reported the blue t-shirt remembers it as blue. The written log clearly reflects a blue t-shirt, and separately notes a yellow t-shirt.

The district court concluded that the log reflecting the blue t-shirt was produced to the defense earlier, and hence the blue t-shirt did not constitute new evidence. Cooper claims the page in question is not stamped in the same format as the other police log pages produced in pre-trial discovery. No explanation is provided for this discrepancy. Even had the page been produced, the t-shirt itself was undeniably never produced. Has the t-shirt gone the way of the destroyed coveralls? Is the blue t-shirt really the yellow t-shirt? How could a

shirt described as blue become yellow? Once again, bungled records and bungled investigative work obscure the truth.

## BLOOD DROP A-41

Blood drop A-41 is the most controversial and crucial aspect of the state's case, yet it was handled carelessly from the time it was first acquired. To begin, no one actually remembers finding A-41; everyone claims that someone else pointed it out.

When originally tested, Cooper's blood type was identified as Type B, and subsequently A-41 was identified as Type B. Soon after, it came to light that Cooper's blood type was actually RB, and then A-41 was determined to be RB as well. One criminologist changed his testimony regarding the depletion of the sample. The criminologist originally thought he ran low on the blood stored inside a small pill box, but later more "appeared" to him that he claimed not to have seen initially. In 1991, the Supreme Court of California determined that after the final pre-trial tests on A-41, the sample was "completely consumed." *People v. Cooper*, 809 P.2d 865, 878 (Cal. 1991).

Criminologist Daniel Gregonis, who tested Cooper's blood, saliva and semen, is alleged to have repeatedly mishandled the biological evidence both pre- and post-trial. Evidence points to the fact that Gregonis broke the seal on A-41 in 1999, potentially contaminating it, and conducted testing of unknown source evidence specimens by placing them alongside the samples drawn from Cooper. In state court, Gregonis testified that he did not open the glassine envelope containing A-41 during the time it was in his unsupervised custody. However, photographic evidence reveals that A-41 was opened and resealed with the initials DJG (Daniel John Gregonis) and the date "8/13/99," which was during the period that the sample was checked out to Gregonis. After trial, Gregonis also allegedly checked out and mislaid a sample of Cooper's saliva. On several other occasions, Gregonis altered his

laboratory notes and changed his testimony about laboratory testing. The chain of custody of the blood sample is also in question due to mishandling by Gregonis.

To make matters worse, the manager of the San Bernadino Sheriff's Crime Laboratory was a heroin addict during the time period in question and was later dismissed from his employment for allegedly stealing heroin from the police evidence cache. As in *House v. Bell*, "the evidentiary disarray" and the "limited rebuttal of it in the present record, would prevent reasonable jurors from placing significant reliance on the blood evidence." 126 S. Ct. 2064, 2083 (2006). Resting Cooper's conviction on the DNA evidence, which was not before the jury, is particularly problematic because of the extensive evidence documenting the mishandling of the evidence.

## THE WIDE AVAILABILITY OF KEDS SHOES

The Keds tennis shoes are perhaps the most damning evidence against Cooper. As the prosecution stated in its opening statement, the shoes "were supplied strictly for prison use within the state of California and unavailable through retail stores in California." However, we now know that the Keds shoes believed at trial to be issued only to prison inmates were actually provided by various government entities, including the Forest Service, Navy, and state hospitals, and were available through retail catalogs.

In district court, Cooper produced a catalog, not before the jury in 1985, that demonstrated that the shoes were available for retail sale. According to Cooper, the widespread availability of the shoes *was known to the prosecution at the time of trial*, as it had been reported by the warden of the minimum security prison from which Cooper escaped. But the prosecution failed to disclose this evidence. Before trial, the warden reported to a lead investigator that the notion that the shoes were prison-issue only was inaccurate and that the shoes were commercially available to the public through Sears Roebuck

and other retail outlets. Cooper's trial attorney confirmed that at the time of trial he was "not aware the Pro Keds Dude tennis shoes were listed for sale in a retail catalogue" and that had he known this information he "would have featured that fact prominently in the defense at trial."

The habeas process does not account for lingering doubt or new evidence that cannot leap the clear and convincing hurdle of AEDPA. Instead, we are left with a situation in which confidence in the blood sample is murky at best, and lost, destroyed or tampered evidence cannot be factored into the final analysis of doubt. The result is wholly discomforting, but one that the law demands.