**Kevin COOPER, Petitioner,**

v.

**Jeanne WOODFORD, Warden, San Quentin State Prison, San Quentin, California, Respondent.**

No. 04–70578.

United States Court of Appeals, Ninth Circuit.

Feb. 9, 2004.

Before SCHROEDER, Chief Judge, KOZINSKI, TASHIMA, SILVERMAN, GRABER, WARDLAW, W. FLETCHER, FISHER, TALLMAN, RAWLINSON and BYBEE, Circuit Judges.

Order; Partial Concurrence and Partial Dissent by Judge SILVERMAN; Dissent by Judge TALLMAN.

## ORDER

A judge of this Court called for en banc review of the February 8, 2004, three-judge panel order in this case. A majority of the non-recused judges has voted in favor of en banc review of petitioner Kevin Cooper's application to file a second or successive petition for a writ of habeas corpus in the district court. *See* 28 U.S.C. § 2244(b)(3)(A). The statute does not allow a petition for rehearing of a denial of authorization to file a second or successive application, but we have *sua sponte* power to rehear such a denial en banc. *Thompson v. Calderon*, 151 F.3d 918, 922 (9th Cir.1998) (en banc), *cert. denied*, 524 U.S. 965, 119 S.Ct. 3, 141 L.Ed.2d 765 (1998); *In re Byrd*, 269 F.3d 585(6th Cir.2001), *cert. denied sub nom. Bagley v. Byrd*, 534 U.S. 1109, 122 S.Ct. 913, 151 L.Ed.2d 880 (2002); *Triestman v. United States*, 124 F.3d 361 (2d Cir.1997). Cooper is scheduled to be executed at 12:01 a.m. tomorrow morning.

The district court denied Cooper's first federal petition in 1997, and we affirmed in *Cooper v. Calderon*, 255 F.3d 1104 (9th Cir.2001), *cert. denied*, 537 U.S. 861, 123 S.Ct. 238, 154 L.Ed.2d 100 (2002).

Through newly obtained counsel, Cooper filed with this Court on February 6, 2004, an application to file a second or successive application in the district court. Cooper also filed a motion for a stay of execution. A majority of the three-judge panel voted to deny the application and the stay yesterday, February 8, 2004.

Cooper has made a claim of actual innocence, accompanied by a claim that the State violated *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). Because Cooper makes a claim of actual innocence accompanied by a claim of a constitutional violation, he is making a "gateway" claim under *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). To make a successful claim under *Schlup,* "a petitioner must show that in light of all the evidence, including new evidence, 'it is more likely than not that no reasonable juror would have found petitioner guilty beyond a reasonable doubt.'" *Carriger v. Stewart,* 132 F.3d 463, 478(9th Cir.1997) (en banc) (quoting *Schlup,* 513 U.S. at 327, 115 S.Ct. 851). The Supreme Court in *Schlup* "emphasized that in considering all the available evidence, the court is not bound by the rules of admissibility, but must consider 'all the evidence, including that alleged to have been illegally admitted (but with due regard to any unreliability of it) and evidence tenably claimed to have been wrongly excluded or to have become available only after the trial.'" *Id.*

Under the Anti–Terrorism and Effective Death Penalty Act (AEDPA), enacted in 1996, a petitioner seeking authorization to file a second or successive application for habeas corpus must satisfy two statutorily imposed conditions. He must show that

 (B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

 (ii) the facts underlying the claim, if proven: and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense.

28 U.S.C. §§ 2244(b)(2)(B)(i) and (ii).

The AEDPA requirements for a second or successive application are stricter than the *Schlup* standard in two ways. First, § 2244(b)(2)(B)(i) requires that "the factual predicate for the claim could not have been discovered previously through the exercise of due diligence." There is no requirement under *Schlup* that the factual claim was not discoverable through the exercise of due diligence. Second, § 2244(b)(2)(B)(ii) requires that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish *by clear and convincing evidence* that, but for constitutional error, no reasonable factfinder would have found the applicant guilty of the underlying offense." (Emphasis added.) *Schlup* requires only that an applicant show that it is "more likely than not" that no reasonable fact-finder would have found him guilty.

■ We should grant authorization to Cooper to file a second or successive application for habeas corpus if we find that he has made a prima facie case of success on the merits of such an application. "By 'prima facie showing' we understand simply a sufficient showing of *possible* merit to warrant a fuller 2075 exploration by the district court." *Woratzeck v. Stewart,* 118 F.3d 648, 650 (9th Cir.1997) (quoting *Bennett v. United States,* 119 F.3d 468, 469 (7th Cir.1997)) (emphasis added).

We do not for purposes of this order decide whether the *Schlup* standard or the standard of 28 U.S.C. § 2244(b)(2)(B) ap-

plies. Under either standard, we hold that Cooper is entitled to file a second or successive application.

## I. Background

On June 2, 1983, Cooper escaped from the minimum security area of the California Institute for Men (CIM) where he was incarcerated. He broke into and hid in an empty house in Chino Hills, about two miles away, in San Bernardino County, southeast of Los Angeles. Cooper made telephone calls from this house to his girlfriend asking for money, but she refused to help him. Cooper's last call from the house was at about 8:00 p.m. on June 4.

The Ryens lived next door, about 125 yards away from the house in which Cooper was hiding. During the night of June 4, 1983, the members of the Ryen household were viciously attacked. Doug and Peggy Ryen, the father and mother, were killed, as were their ten-year-old daughter, Jessica, and an eleven-year-old houseguest, Chris Hughes. Doug and Peggy's eight-year-old son, Josh, was left for dead but survived. The bodies of Doug, Peggy, Jessica, and Chris, as well as the still-living Josh, were discovered the next day by Chris's father. All of the murder victims were killed by multiple chopping, cutting, and puncture wounds. Josh suffered the same type of wounds. Jessica was found clutching a substantial amount of fairly long blond or light brown hair in her hand.

Cooper was apprehended at the end of July 1983, and he was tried for capital murder in late 1984 and early 1985. Cooper took the stand and testified that he was innocent. He has consistently maintained his innocence since that time. Cooper testified at trial that he never went to the Ryen house. He testified that he left the house in which he had been staying after that last phone call at 8:00 pm on June 4 and hitchhiked to Mexico. Uncontradicted evidence at trial indicated that Cooper checked into a hotel in Tijuana at about 4:30 p.m. the next day, June 5. After seven days of deliberation, the jury found Cooper guilty of death-eligible first degree murder. After four additional days of deliberation, the jury sentenced Cooper to death.

## II. *Brady* Violation

█ Cooper attaches two new sworn declarations to his application, both signed in January 2004. These declarations, if believed, appear to indicate that a *Brady* violation has taken place and that crucial evidence introduced at trial was not reliable. Only two pieces of evidence at trial connected Cooper to the Ryen house. One was a bloody tennis shoe print found on a sheet in Doug and Peggy's bedroom. The other was a single spot of blood found on a wall in the hallway.

There was testimony at trial about the print of a "Pro–Ked Dude" tennis shoe found on a sheet in the Ryens' bedroom, as to which the testimony of two witnesses, William Baird and James Taylor, was particularly important. The California Supreme Court specifically discussed and relied on the testimony of these two men in sustaining Cooper's conviction on direct appeal. *People v. Cooper*, 53 Cal.3d 771, 797–98, 281 Cal.Rptr. 90, 809 P.2d 865 (1991).

A company representative testified at trial that "Pro–Ked Dude" tennis shoes are manufactured by Stride Rite solely for distribution in prisons and other institutions. They are not distributed to the general public. The sheet from the Ryens' bedroom was initially not thought to have any footprints. However, a bloody footprint was discovered on the sheet after it was taken to the lab and refolded in the manner it had been folded when the footprint was made. William Baird, the Crime

Laboratory Manager, testified that the shoe print on the sheet matched two prints found in the other house, and that all of the prints had been made by a close-to-new "Pro–Ked Dude" shoe. Baird further testified that he had a close-to-new "Pro–Ked Dude" shoe of approximately the same size in his lab, previously obtained from another prison. He testified that this shoe allowed him to analyze the print on the sheet and determine that it had come from a prison-issued "Pro–Ked Dude" shoe.

James Taylor, an inmate at CIM during the time Cooper was incarcerated, was a recreation attendant. Taylor testified at trial that he initially gave Cooper a pair of "P.F. Flyer" tennis shoes. He testified that Cooper, then imprisoned under the false name of David Trautman, exchanged his "P.F. Flyers" for a pair of black "Pro–Ked Dudes" a few days before he was transferred to the minimum security area. Cooper escaped from the prison soon after he was transferred to the minimum security area.

Cooper attaches to his application a sworn declaration of Midge Carroll, who was Warden of CIM at Chino while Cooper was incarcerated there. Warden Carroll's declaration, dated January 30, 2004, states:

1. I was the Superintendent, or Warden, of the California Institution for Men at Chino, California, from 1982 through 1985. As Warden of this state penal facility, I had extensive contact with members of the San Bernardino Sheriff's Department who were responsible for the investigation of Kevin Cooper as a suspect in what became known as the Chino Hills Murders.

2. I was employed by the California Department of Corrections from 1966 until I permanently retired in 1999. . . .

3. As the Warden of the California Institute for Men at Chino, my contact with San Bernardino County deputy sheriffs about aspects of the investigation in the Kevin Cooper case included conversations with one of the lead detectives about shoeprint evidence found at the crime scene. I communicated to one of the lead investigators that the notion that the shoeprints in question likely came only from a prison-issue tennis shoe was inaccurate. I came to this conclusion after conducting a personal inquiry of the appropriate staff, including the deputy warden, the business manager responsible for procurement, and the personnel responsible for warehousing. I learned that the shoes we carried were not prison-manufactured or specially designed prison-issue shoes. I learned that the shoes were common tennis shoes available to the general public through Sears and Roebuck and other such retail stores. I passed this information along to the detective. Had I been contacted, I would have testified to this on behalf of either the prosecution or defense, and I would have provided supporting documentation.

Cooper also attaches a sworn declaration of his present counsel stating that Cooper's investigators became aware of the information contained in Warden Carroll's declaration on January 30, 2004, the date the declaration was signed.

The declaration of Warden Carroll makes out a prima facie case of a *Brady* violation. The date of the Carroll declaration, and counsel's declaration that Cooper first became aware of the information in the Carroll declaration on that same date, together make out a prima facie case that the information could not have been previously discovered through the exercise of due diligence.

█ Under *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), the prosecution has a constitution-

al obligation to turn material exculpatory evidence over to the defendant. This obligation is independent of any specific request by the defendant for such information. *United States v. Agurs*, 427 U.S. 97, 107, 96 S.Ct. 2392, 49 L.Ed.2d 342 (1976). Evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682, 105 S.Ct. 3375, 87 L.Ed.2d 481 (1985); *see also Strickler v. Greene*, 527 U.S. 263, 280, 119 S.Ct. 1936, 144 L.Ed.2d 286 (1999); *Kyles v. Whitley*, 514 U.S. 419, 433–34, 115 S.Ct. 1555, 131 L.Ed.2d 490 (1995).

The significance of Warden Carroll's communication would have been clear to San Bernardino Sheriff's Department investigators. Because of the testimony of Baird and Taylor, the State was able to tell a damaging story about the presence of a bloody "Pro–Ked Dude" footprint in the bedroom of the murder victims, a footprint only Cooper, an escaped prisoner, could have left. But if Warden Carroll had been put on the stand and had been believed by the jury, the jury would have known that Cooper was almost certainly not wearing "Pro–Ked Dude" shoes.

Cooper also attaches to his declaration a hand-written sworn declaration of James Taylor, dated January 8, 2004, which states:

1. I was an inmate at the Reception Center West (RC–W) at the California Institute for Men in Chino California in May and June of 1983.

2. During that period of time, I met David Trautman, whose real name I understand to be Kevin Cooper. I met Kevin when he tried out for the basketball team. My job at the prison was recreation attendant. I was responsible for issuing basketball shoes to men in our unit who played on the team.

3. I issued only one pair of shoes to Kevin Cooper. I issued him a pair of P.F. Flyers. This brand was the best brand of shoe for basketball that the prison stocked. Kevin did not trade these shoes in to me for a pair of Keds, nor did he trade these shoes in to me for any other pair.

The new Taylor declaration is, of course, consistent with the Carroll declaration. If the information in Warden Carroll's declaration is true, it is necessarily true that Taylor could not have handed out "Pro–Ked Dude" shoes to Cooper. Taylor's new declaration states that he did not, in fact, hand out such shoes.

### III. Other Evidence

Once a *Brady* violation has been established, a federal habeas court is required to evaluate all information in the case, not just information relevant to the *Brady* violation. Other evidence in the case suggests that about three Caucasian or Mexican men, rather than Cooper, might have committed the murders. Such evidence includes initial statements of Josh Ryen in the hospital, who stated that three or four men committed the murders, and that the men did not have black or brown skin. While still in the hospital, Josh Ryen saw a picture of Cooper on television and stated that he was not one of the men. Josh Ryen identified Cooper at trial as the murderer, but his earlier statements are inconsistent with this identification. Jessica Ryen was found with numerous strands of blond or light brown hair clutched in her hand. Cooper, an African–American, could not be the source of the hair. That hair has not been tested, despite a request by Cooper.

Diana Roper has earlier supplied a sworn declaration that her then-boyfriend, Lee Furrow, came home late on the night of the murders without a t-shirt he had

been wearing earlier in the day. He wore, instead, blood-spattered coveralls, which he took off and left at the house with Roper. Five days later, Roper turned the coveralls over to police, but the police threw the coveralls away without testing them and without alerting Cooper's counsel to their existence. Further, Kenneth Koon confessed to a fellow inmate, with whom he was smoking marijuana in prison, that he and two other men had committed the Ryen/Hughes murders. According to the inmate who reported the conversation, Koon said they had gone to the Ryen house to "collect a debt" but had "hit the wrong house." Koon said that two of the men went afterwards to his "old lady's house" to leave bloody coveralls. Koon had previously been romantically involved with Roper.

A bloody t-shirt and a blood-stained hatchet were found beside the road, in separate locations, after the murders. Roper states in her declaration that Furrow's hatchet was missing, and that the murder weapon had the same distinctive handle as Furrow's hatchet. Roper further states that she is sure the recovered bloody Fruit–of–the–Loom t-shirt is the same shirt Furrow was wearing earlier on the day of the murders.

Finally, two declarations have been filed during the last day and a half from two women who were in a bar near the Ryens' house on the night of the murders. One of the declarations states that three men came into the bar, but that one of the three stayed in the background. The declaration states that the other two men "were very loud and obnoxious and behaved bizarrely." It says that one of the two had longer-than average "medium brown or dirty blond hair." The other man wore coveralls. The other declaration describes two blond men. Both declarations state that the front of the two men's clothing and faces were splattered with blood. The men spoke in a kind of gibberish and appeared to be under the influence of drugs.

There was, of course, evidence pointing to Cooper's guilt at trial. Salient among that evidence was a spot of blood taken from a hallway in the Ryen house, the bloody t-shirt, and a hand-rolled cigarette found in the Ryens' abandoned car in Long Beach. Pursuant to an agreement between Cooper and the State, all three of these pieces of evidence have been subjected to DNA testing. All three tests resulted in a positive match with Cooper's DNA. Despite this DNA evidence, Cooper continues to maintain his innocence.

Cooper requests that a further test be done on the bloody t-shirt to determine whether EDTA, a preservative agent, is in that blood. If EDTA is present, Cooper maintains, that will show that his blood was placed on the t-shirt after the fact by someone who had access to his drawn blood. The State has refused to perform a test for EDTA.

## IV. Authorization to File Application

██ We are not in a position fully to evaluate the strength of Cooper's *Brady* claim. Nor are we in a position to undertake the difficult task of evaluating the information derived from the *Brady* claim in light of the other evidence in the case, treating much of that evidence with the deference required for prior factfinding by the state courts. We hold only that Cooper has made out a prima facie case that entitles him to file a second or successive application. A prima facie showing on one claim in a second or successive application permits an applicant to "proceed upon his entire application in the district court." *Woratzeck*, 118 F.3d at 650.

* * *

This case centers on Cooper's claim that he is innocent. No person should be executed if there is doubt about his or her guilt and an easily available test will determine guilt or innocence. Cooper has asked specifically that two tests be done.

First, Cooper asks that the blood on the t-shirt be tested for the presence of the preservative EDTA. The presence of such a preservative would show that his blood was not on the t-shirt at the time of the killings, but was rather placed there at some later time.

Second, Cooper asks that the blond or light brown hair in Jessica Ryen's hand be subjected to mitochondrial DNA testing. Such testing, if favorable to Cooper, would exclude other members of the Ryen family and Chris Hughes as sources of the hair. It could also positively identify Lee Furrow, and perhaps others, as the killer or killers, if those men can now be located.

In his brief to us, Cooper states, "Through readily available mitochondrial testing of blond hairs found in one of the victim's hands, and testing for the presence of the preservative agent EDTA on a T-shirt[ ] the State belatedly claimed contained Mr. Cooper's blood, the question of Mr. Cooper's innocence can be answered once and for all."

The district court may be in a position to resolve this case very quickly. As soon as Cooper's application is filed, it should promptly order that these two tests be performed in order to evaluate Cooper's claim of innocence.

In accordance with the foregoing, we authorize Cooper to file his second or successive application for habeas corpus in the district court. We order Cooper's execution stayed pending the resolution of that application.

**IT IS SO ORDERED.**

SILVERMAN, Circuit Judge, with whom RAWLINSON, Circuit Judge, joins, concurring in part and dissenting in part.

Cooper is either guilty as sin or he was framed by the police. There is no middle ground.

Cooper asserts a freestanding claim of actual innocence. In *Herrera v. Collins*, 506 U.S. 390, 393, 113 S.Ct. 853, 122 L.Ed.2d 203 (1993), the Supreme Court held that a freestanding claim of actual innocence based on newly discovered evidence was not a ground for habeas corpus relief. *See also Turner v. Calderon*, 281 F.3d 851, 872 (9th Cir.2002). However, the Supreme Court assumed, without deciding, that "in a capital case a truly persuasive demonstration of 'actual innocence' made after trial would render the execution of a defendant unconstitutional, and warrant federal habeas relief if there were no state avenue open to process such a claim." *Herrera*, 506 U.S. at 417, 113 S.Ct. 853. The Court noted that "the threshold showing for such an assumed right would necessarily be extraordinarily high." *Id.; see also Schlup v. Delo*, 513 U.S. 298, 315–16, 115 S.Ct. 851, 130 L.Ed.2d 808 (1995). We have held that "a habeas petitioner asserting a freestanding innocence claim must go beyond demonstrating doubt about his guilt, and must affirmatively prove that he is probably innocent." *Carriger v. Stewart*, 132 F.3d 463, 476–77 (9th Cir.1997) (rejecting a *Jackson v. Virginia* modified sufficiency of the evidence test for such claims); *see also Turner*, 281 F.3d at 872; *Jackson v. Calderon*, 211 F.3d 1148, 1164 (9th Cir.2000), *cert. denied*, 531 U.S. 1072, 121 S.Ct. 764, 148 L.Ed.2d 665 (2001).

Everything comes down to the bloody t-shirt. At trial, the prosecution presented no evidence that the t-shirt contained Cooper's blood. Cooper subsequently sought DNA testing to show that he did not com-

mit the murders. DNA testing established that the shirt contained Cooper's blood and the blood of one or more of the victims. This is very damning evidence, but Cooper contends that his blood was planted on the shirt by law enforcement officers. If the blood was planted, he says, it will reflect a high level of EDTA, a preservative agent contained in the vial in which the blood was stored. A high level of EDTA will show that the blood came from the vial rather than directly from him, proving that the police tampered with evidence in an effort to frame him. Conversely, if the blood is *not* contaminated by EDTA, the shirt conclusively proves his guilt. As Cooper himself puts it, "the question of Mr. Cooper's innocence can be answered once and for all." [1]

Since Cooper's guilt can be quickly and definitively determined by means of a simple test, there is no reason not to have it performed prior to his execution. I would hold in abeyance Cooper's application to file a second or successive petition, and I would order the parties to promptly arrange for the testing of the shirt. I would stay his execution in the meantime. The public cannot afford a mistake. Neither can Cooper.

TALLMAN, Circuit Judge, with whom Circuit Judge BYBEE joins, dissenting from En Banc Stay Order.

Because the court acts to stay the execution of Kevin Cooper in derogation of the standard set by Congress for evaluating successive habeas corpus petitions, I respectfully dissent. We do not apply the familiar standards as if this case were on direct or collateral review. The court ducks the question whether the standard announced in *Schlup v. Delo,* 513 U.S. 298, 115 S.Ct. 851, 130 L.Ed.2d 808 (1994), has

been superceded by AEDPA. The majority finds that, under either standard, Cooper has made his case for a successive habeas petition. With the greatest respect for the concerns expressed by my colleagues in the majority, I disagree.

For successive appeals like this, 28 U.S.C. § 2244(b)(2) controls:

A claim presented in a second or successive habeas corpus application under section 2254 that was not presented in a prior application shall be dismissed unless—

(B)(i) the factual predicate for the claim could not have been discovered previously through the exercise of due diligence; and

(ii) the facts underlying the claim, if proven and viewed in the light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense.

Applying this standard, the panel majority (Circuit Judges Rymer and Gould) carefully evaluated the merits of Cooper's eleventh hour attempt to delay the imposition of his sentence in this 21–year–old case. *See* Order entered 2/08/04.

Under § 2244(b)(2)(B)(i), Cooper must establish that the factual predicate for any constitutional claim "could not have been discovered previously through the exercise of due diligence." He has not met this burden. With regard to Cooper's *Brady* claim concerning the prosecution's alleged failure to inform the defense of the Chino warden's information concerning the general availability of the Pro–Ked shoes, the proper test under § 2244(b)(2)(B)(i) is

---

**1.** Cooper represents to the court that his next-of-kin intends to obtain the t-shirt and test it for EDTA even if the execution goes forward.

whether this information was available upon the exercise of due diligence. The warden's declaration explicitly states that she was ready and willing to share this information with the defense. The fact that the warden only recently came forward with this information is not dispositive under § 2244(b); the defense's utter failure to independently investigate the issue evinces a lack of diligence.

Even if Cooper could meet the (B)(i) due diligence standard, he has not made a prima facie showing of a constitutional violation. *See* 28 U.S.C. §§ 2244(b)(2)(B)(ii), (b)(3)(C). The majority cites the standard set forth in *Schlup v. Delo,* finding that had the warden's information been provided to the defense and presented at trial, it is "more likely than not" that a reasonable factfinder would not have found Cooper guilty. Although we have not specifically addressed and resolved the question of *Schlup's* applicability post-AEDPA, I believe that *Schlup's* "more likely than not" standard is irreconcilable with the "clear and convincing" standard of AEDPA. Cooper has failed to show that the facts offered, "if proven and viewed in the light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable fact-finder would have found the applicant guilty of the underlying offense." § 2244(b)(2)(B)(ii). Therefore, he does not satisfy the stringent statutory requirements for filing a successive habeas petition. *See David v. Hall,* 318 F.3d 343, 347 n. 5 (1st Cir.2003); *Flanders v. Graves,* 299 F.3d 974, 977 (8th Cir.2002); *In re Minarik,* 166 F.3d 591, 600 (3d Cir. 1999).

Even assuming for purposes of this argument that *Brady* information was withheld, Cooper cannot satisfy the § 2244(b)(2)(B)(ii) standard because *Brady* is not violated unless the information withheld is material. *See Brady v. Maryland,*

373 U.S. 83, 87, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963). First, the best evidence is not the warden's hearsay, but the testimony introduced by the state at trial. Contrary to the majority's reading of the warden's affidavit, she did not state that tennis shoes issued at Chino were different from tennis shoes issued at other prisons. Rather, she stated that "the notion that the shoeprints in question likely came only from a prison-issue tennis shoe was inaccurate." At Cooper's trial, the key footwear-related evidence was the testimony of the Stride Rite shoe company representative, who testified that Pro–Ked Dude shoes were sold exclusively to state institutions and that the tread on the soles of these shoes were unique to his brand. Additionally, James Taylor, an inmate at Chino, testified that he issued a pair of black Pro–Ked Dude shoes to Cooper shortly before Cooper escaped. Although the warden's information contradicts the representative's and Taylor's testimony, there is no reason to believe that the warden was in a better position than the Stride Rite representative to opine on the distribution of Pro–Ked Dude shoes in prisons, or that she could contradict Taylor's testimony that he, in fact, issued Cooper a pair of these shoes. Because the warden's research consisted merely of asking prison personnel about the availability of this brand of shoes, her recent declaration does not undercut the evidence offered at trial.

Even if the warden's claim was completely credited—that the Pro–Ked shoes issued to prisoners at Chino could be purchased generally—it does not undermine the key evidence the jury heard. The critical fact is that the same shoe pattern prints were found inside the Ryen house (where the murders occurred), just outside the Ryen house, and in the Lease house (where Cooper indisputably stayed). Whether these shoes were available to the general public or only to prison inmates,

the same prints were found in both homes. Viewed against the evidence as a whole, the information that Cooper now urges is not sufficient to establish by clear and convincing evidence that, but for the alleged constitutional errors, no reasonable jury could have concluded that he was guilty even if the warden's information had been available to the defense at trial. *See* 28 U.S.C. § 2244(b)(2)(B)(ii). Indeed, we could not conclude even under *Schlup* that Cooper's evidence is sufficient to justify yet another round of habeas review. As Justice O'Connor observed in *Schlup,*

> "[A] petitioner does not pass through the gateway erected by *Murray v. Carrier,* 477 U.S. 478 [106 S.Ct. 2639, 91 L.Ed.2d 397] (1986), if the district court believes it more likely than not that there is any juror who, acting reasonably, would have found the petitioner guilty beyond a reasonable doubt."

513 U.S. at 333, 115 S.Ct. 851 (O'Connor, J., concurring).

The majority further finds that Cooper has met the extraordinarily high burden under AEDPA for bringing an evidence tampering claim in a successive petition. Cooper's claim that the bloody T-shirt was tampered with is, at its core, the same claim he raised at trial and at every proceeding since trial. He has repeatedly contended that the San Bernardino County Sheriff's Office and crime lab employees tampered with and manipulated evidence. The portion of the t-shirt that matched Cooper's DNA was in the continuous possession of the state superior court since the trial. Accordingly, the contamination would have to have occurred before trial and before the advent of forensic DNA testing. Therefore, as far as we know, the state never received the benefit of any such conspiracy to tamper with evidence. At trial, the state only contended that the stain belonged to victim Doug Ryen.

As the panel noted, the state trial court determined at the evidentiary hearing that "Cooper's claims lacked merit." The panel also accurately stated, "We resolved in connection with Cooper's motion for a second habeas corpus petition that nothing claimed about the DNA testing satisfies the requirements for a second or successive application." More than one court has reviewed this evidence tampering claim and found it unpersuasive. In his application, Cooper fails to present any newly discovered facts sufficient to justify allowing him to bring the successive petition.

Regarding the Slonaker and Mellon–Wolfe declarations, the defense fully explored at trial the issue of who was present at the Canyon Corral Bar and what occurred there on the night of the murders. Edward Lelko, the bartender at the Canyon Corral Bar that night who had come forward the next day on his own volition to tell the police what he had seen, was called by the defense at trial. He, at no point, testified or reported to police that the suspicious patrons were spattered with blood. Furthermore, the prosecution called Shirley Killian, the manager of the Canyon Corral Bar, who testified that the men had close-cut military-type haircuts and wore light-colored t-shirts. She noticed no blood or stains on their shirts or clothing. It is inconceivable that two witnesses who saw these men—one called by the defense, and the other by the prosecution—would not have noticed it. Accordingly, none of this information would be sufficient, even if proven, to establish by clear and convincing evidence that no reasonable juror could have found Cooper guilty. At best, he has discovered additional evidence for impeachment, but not to establish actual innocence.

Furthermore, the majority fails to appreciate the powerful circumstantial evidence tying Cooper to these crimes. Lost

in defense counsel's voluminous pleadings with which we have been inundated over the past two days are a number of crucial facts. As noted above, the same shoe impression was found inside the Ryen house, just outside it, *and* in the Lease house. The evidence is undisputed that Cooper was the only suspect inside the Lease house. There are no other shoe prints.

Also conspicuous by its absence is any mention by the defense that a red-stained button, identical to those worn on prison-issue field jackets, was found in the bedroom of the Lease home where Cooper admits he was hiding out and where he apparently showered after the murders. Luminol tests showed the presence of blood on the shower wall and Cooper's foot print was found on the sill of the shower. Long before any DNA testing was conducted, blood evaluation by the crime laboratory of the bloody spot on the wall of the Ryen murder scene showed characteristics attributable to African Americans. No other suspect that Cooper now offers in variations of his defense theory that someone else murdered the Ryen family and their young guest is African–American.

After careful, thoughtful, and thorough consideration of this procedurally and factually byzantine case, the panel correctly determined that Cooper fails to satisfy AEDPA's stringent standard for bringing a successive habeas petition. This is not the "extraordinary case" justifying a stay of execution based upon a claim of actual innocence. *Schlup*, 513 U.S. at 321, 115 S.Ct. 851. Because the panel was correct, I respectfully dissent.