FILED

**FOR PUBLICATION**

OCT 26 2010

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

| | |
|---|---|
| JEFFREY TIMOTHY LANDRIGAN, | No. 10-99021 |
| Plaintiff - Appellee, | D.C. No. 2:10-cv-02246-ROS<br>District of Arizona, |
| v. | Phoenix |
| JANICE K. BREWER; CHARLES L. RYAN; ERNEST TRUJILLO; CARSON MCWILLIAMS, | ORDER |
| Defendants - Appellants. | |

Before: RYMER, WARDLAW, and W. FLETCHER, Circuit Judges.

A judge of this court *sua sponte* called for this case to be reheard en banc. A vote was taken, and a majority of the active judges of the court did not vote for a rehearing en banc. Fed. R. App. 35(f). The call for this case to be reheard en banc is DENIED.

*Landrigan v. Brewer*, No. 10-99021

Circuit Judges **WARDLAW** and **W. FLETCHER**, with whom Judges **PREGERSON** and **BERZON** join, concurring in the denial of rehearing en banc:

As Chief Justice Roberts, writing for the three-justice plurality, observed in *Baze v. Rees*, 553 U.S. 35, 62 (2008), "[o]ur society has . . . steadily moved to more humane methods of carrying out capital punishment. The firing squad, hanging, the electric chair, and the gas chamber have each in turn given way to more humane methods, culminating in today's consensus on lethal injection." In *Baze*, the Supreme Court approved the execution method employed by the state of Kentucky, while simultaneously highlighting that imposition of the death penalty is a solemn matter of serious public concern, with important implications for the preservation of human dignity. The State's repeated refusal in this case to comply with the district court's orders to provide it with critical information about the provenance and efficacy of the foreign-source drug, which the state announced only five days ago it planned to use to execute Landrigan, has precluded the district court from resolving his fundamental Eighth Amendment claim that the sodium thiopental the State plans to use to anesthetize him creates a substantial risk of harm. The State's gamesmanship is unseemly at best, and inhumane at worst.

1

Applying our highly deferential standard of review, *see Lopez v. Candaele*, --- F.3d ----, 2010 WL 3607033, at \*4 (9th Cir. 2010)*,* our panel concluded that the district court properly acted within its discretion when it ordered a temporary stay after properly weighing the *Winter* factors. *See Winter v. Natural Res. Defense Council*, 129 S. Ct. 365, 374 (2008). In a separate action, our panel denied Landrigan's application to file a second or successive habeas petition in the district court based upon newly discovered DNA results, concluding that there was no constitutional error supporting that relief.[1] Thus, neither our panel opinion nor the district court's temporary stay of execution grants Landrigan any relief on the merits of his underlying conviction or death sentence. As a practical matter, the question is whether Landrigan will be executed today or in a few months; the net effect is that Landrigan's execution will be delayed at most until such time as the only American manufacturer of sodium thiopental can begin operations in 2011. Certainly, moreover, the district court's order has provided the State with the opportunity to come forward with evidence demonstrating that the sodium thiopental it wishes to use will perform as it is supposed to, and will obviate the risk of excruciating pain from the drug causing paralysis and cardiac arrest that would follow. *See Baze*, 553 U.S. at 44.

---

[1]We attach the Order denying Landrigan's application to file a second or successive habeas petition under 28 U.S.C. § 2244(b)(2) as Appendix A.

2

We review the district court's grant of a preliminary injunction for abuse of discretion. *Candaele*, at *4 (citing *Johnson v. Couturier*, 572 F.3d 1067, 1078 (9th Cir. 2009). (We apply the same abuse-of-discretion standard to temporary restraining orders. *See, e.g.*, *Woratzeck v. Ariz. Bd. of Exec. Clemency*, 117 F.3d 400, 402 (9th Cir. 1997).) "This review is 'limited and deferential' and it does not extend to the underlying merits of the case." *Johnson*, 572 F.3d at 1067 (quoting *Am. Trucking Ass'ns v. City of Los Angeles*, 559 F.3d 1046, 1052 (9th Cir. 2009)). "[T]he scope of our review is 'generally limited to whether the district court [1] employed the proper preliminary injunction standard and [2] whether the court correctly apprehended the underlying legal issues in the case.'" *Guzman v. Shewry*, 552 F.3d 941, 948 (9th Cir. 2009) (quoting *Earth Island Inst. v. U.S. Forest Serv.*, 351 F.3d 1291, 1298 (9th Cir. 2003)). "In other words, '[a]s long as the district court got the law right, it will not be reversed simply because the appellate court would have arrived at a different result if it had applied the law to the facts of the case.'" *Id.* (quoting *Wildwest Inst. v. Bull*, 472 F.3d 587, 589 (9th Cir. 2006)). Here, the district court got the law right, and did not abuse its discretion in temporarily staying Landrigan's execution to permit time for review of Arizona's proposed use of a drug, the provenance and efficacy of which

3

remained a mystery to Landrigan, his attorneys, the public, and even the judges of this court.

Landrigan made a showing based on expert declarations and citations to the Supreme Court's decision in *Baze*—a thin showing, but a showing nevertheless—that an unidentified, foreign-source drug about which nothing is known has a greater risk of serious harm than a drug about which something is known (like sodium thiopental from Hospira, the sole FDA-approved domestic distributor). See *Baze*, 553 U.S. at 53 ("It is uncontested that, failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation from the administration of pancuronium bromide and pain from the injection of potassium chloride."). The State countered that it had legally obtained sodium thiopental from a foreign source with an expiration date of May 2014 in a sufficient quantity, and it pointed to built-in protections in the protocol.

As the district court explained at length, the delay in dealing with the provenance and efficacy of the sodium thiopental is due to the state's tactics, and not to any tardiness on the part of Landrigan. *See* District Court Order at 11-14.

4

Chief Judge Kozinski posits that Arizona's procedural safeguards go beyond those adopted elsewhere,[2] and that they are there to ensure that the prisoner is in fact unconscious before the second and third drugs are administered. However, the safeguards built into the Arizona protocol protect against failed administration, not necessarily against a flawed drug. The safeguards are in the nature of physical monitoring, and so do not address the situation in which defective sodium thiopental wears off after the paralytic has been administered, or in which this particular sodium thiopental procured by the state is in fact adulterated, or is even some other drug, and causes pain without rendering Landrigan unconscious.

The drug in the Kentucky protocol that passed muster in *Baze* was sodium thiopental from the sole American supplier, Hospira. (Among the exhibits in *Baze* were copies of the drug labels showing that the sodium pentathol procured by the state was manufactured by Abbott Laboratories, which later spun off Hospira. *See Joint Appendix*, Vol. III, at 844, 847, *Baze v. Rees*, 553 U.S. 35 (2008) (copies of drug labels)).[3] The significance is that, by virtue of being approved by the FDA,

---

[2] Whether the Arizona protocol itself passes constitutional muster is pending before this court in a separate appeal from the district court's grant of summary judgment to the state in *Dickens v. Brewer*, No. CV07-1770 (NVW), 2009 WL 1904294 (D. Ariz. July 1, 2009).

[3] The State does not suggest that it has ever obtained sodium thiopental from any source other than Hospira (or Abbott Laboratories), nor does it dispute that at the time of Arizona's last execution in 2007, Hospira was still the only U.S.

the Hospira-distributed drug carries with it some assurance of integrity. The same cannot be said of some version of the drug manufactured by an unknown entity under unknown conditions to unknown specifications. Neither the district court nor the panel suggest that FDA approval of an execution drug is required by the Eighth Amendment; such approval, however, provides some level of confidence that the drug works for its intended purpose. Moreover, the district court also indicated that the state could merely substitute "another available, FDA-approved barbiturate" if it wished to proceed with the execution immediately, instead of waiting until early 2011, when Hospira will begin manufacturing again.

What is missing in the record here is evidence that the drug the State intends to use works for its intended purpose. The State made no showing, publicly (in redacted form or otherwise), or privately in its *in camera* submission to the district court, about the efficacy of the drug it obtained. It would not have been hard for the state to do so, either voluntarily or in compliance with the district court's order. As the district court said, "Defendants could have submitted an affidavit stating that the drug was obtained through reputable sources and there was no reason to question that it would function as intended." But the state submitted no such affidavit.

---

FDA-approved manufacturer of the drugs.

For whatever reason, the State chose not to file any declarations in district court of any sort, and chose not to file its *in camera* submission in our court.[4] Apart from one line in the second paragraph of its motion to lift the stay – where the State simply indicates that it provided information for *in camera* review by the district court—it chose not to make a point of what that information consisted of, or what that information means. This was a litigation choice. The district court considered the submission and found no information regarding the efficacy of the sodium thiopental the State had obtained. The State could have argued this was wrong and asked us to take a look for ourselves, but it did not. There is no basis in the record before us to call the district court's finding into question.

But if one does look at the *in camera* submission, it lists the manufacturer and the distributor from whom the drugs were purchased, and attaches promotional material off the manufacturer's web site. It has no information on the sodium thiopental itself, and none on the manufacturer's (or broker's) experience with it. In other words, it provides no information about the drug's efficacy beyond the name of the manufacturer. Moreover, examination of the *in camera* submission reveals no justification whatever for the State's refusal to provide the information to Landrigan, as the district court ordered. Our courts operate on an adversarial

_____

[4]The State belatedly did so only after we issued our ruling in which we noted its failure to rebut Landrigan's showing.

7

basis; submissions *in camera* are acceptable only in very rare circumstances, where as the district court here recognized, the information is privileged or subject to other statutory protection.  A party and his lawyers may, through research, additional evidence, and advocacy, succeed in proving that information that appears benign to a judge is not.  And although the dissent from the denial of rehearing en banc (at 6) suggests that Arizona has a legitimate interest in avoiding a public attack on its foreign drug source, we fail to see how that interest could justify precluding a plaintiff from obtaining information pertinent to his claims. There are a very few interests that justify keeping otherwise-pertinent information from an opposing party; shielding a non-party corporation from public criticism is surely not one of them.

Although the Supreme Court in *Baze* and the district court in *Dickens* were concerned with the protocol itself and did not directly address the source of the drugs in the "cocktail" each approved, Hospira was the source of the sodium thiopental used in *Baze*.  *Baze* assumed a proper dose of sodium thiopental when it observed that "failing a proper dose of sodium thiopental that would render the prisoner unconscious, there is a substantial, constitutionally unacceptable risk of suffocation" from administration of the two other drugs.  *See* 553 U.S. at 53.  The

8

State has not disputed that it previously used Hospira-manufactured sodium thiopental for the first injection, but simply ran out of it.

Given Arizona's refusal (or inability) to stand behind its newly obtained drug as a "proper dose," or say anything about efficacy, and given that this is an equitable proceeding, we concluded that the district court did not abuse its discretion in staying the execution temporarily. Our decision does not mean that Landrigan will not be executed; instead, it simply means that Landrigan's execution will be delayed until either the courts have time to consider the constitutionality of the state's proposed use of sodium thiopental obtained from a foreign source or—at most—until early next year, after Hospira resumes manufacturing the drug.

We respectfully concur with denial of rehearing en banc.

FILED

FOR PUBLICATION

OCT 25 2010

UNITED STATES COURT OF APPEALS

MOLLY C. DWYER, CLERK
U.S. COURT OF APPEALS

FOR THE NINTH CIRCUIT

JEFFREY TIMOTHY LANDRIGAN, )
                              )
      Petitioner-Appellant,    )
                              )
            v.              )
                              )
ERNEST TRUJILLO, Warden of   )
Arizona State Prison Complex-Eyman,)
                              )
          and           )
                              )
CHARLES L. RYAN, Director of the )
Arizona Department of Corrections,  )
                              )
      Respondents-Appellees.  )
_____ )

No. 10-73241

D.C. No. CV-10-2246-PHX-ROS

**ORDER**

Before:    RYMER, WARDLAW, and W. FLETCHER, Circuit Judges.

Arizona death-row prisoner Jeffrey Landrigan asks this court for authorization to file a second or successive (SOS) application for a writ of habeas corpus in district court pursuant to 28 U.S.C. § 2244(b)(2). He also seeks a stay of his scheduled execution date of October 26, 2010.[1] We deny both requests.

---

[1] To the extent Landrigan also asks this court to convene an en banc panel to consider his request to file an SOS petition as an initial matter, the request is denied as an application to file an SOS petition must be heard by a three-judge

(continued...)

Chester Dean Dyer's body was found in his apartment on December 15, 1989 after he failed to show up for work.[2] On December 13, 1989, before his death, Dyer had called a friend, Michael, and told Michael he had picked up a man known to him as "Jeff." In another phone call a few minutes later Dyer told Michael that he was currently having sexual intercourse with Jeff. In a third call Dyer asked whether Michael could get Jeff a job and Michael spoke to Jeff about possible employment. When Dyer was found he was fully clothed, face down on his bed, with a pool of blood at his head. An electrical cord hung around his neck. Ligature strangulation was the cause of death. Medical testimony at the presentence hearing indicated that Dyer probably was strangled after being rendered unconscious from blows to the head with a blunt instrument.

When first questioned, Landrigan denied knowing Dyer or having been to his apartment. However, Landrigan was wearing one of Dyer's shirts when he was arrested. Fingerprints from the scene matched Landrigan's, and a shoeprint taken from Dyer's apartment matched one of Landrigan's sneakers. The sneaker had a small amount of blood on it that matched blood on the shirt Dyer wore.

---

[1](...continued)
panel.  28 U.S.C. § 2244(b)(3)(B).

[2] The facts are taken from the Arizona Supreme Court's opinion on direct appeal. *Arizona v. Landrigan*, 859 P.2d 111, 113-14 (Ariz. 1993).

-2-

Landrigan's ex-girlfriend testified that, in a telephone conversation in December of 1989, Landrigan told her he was "getting along" in Phoenix by "robbing." And in a phone call around Christmas, Landrigan told her that he had "killed a guy . . . with his hands" about a week before.[3]

Landrigan was convicted on June 28, 1990 of theft, second degree burglary, and felony murder for having caused the victim's death in the course of and in furtherance of the burglary. The jury also found that Landrigan had been convicted in Oklahoma of assault and battery with a deadly weapon, second degree murder, and possession of marijuana. At the time of the Dyer murder, he was an escapee from an Oklahoma prison.

The trial judge (who was also the sentencer) found two statutory aggravating circumstances under Ariz. Rev. Stat. § 13-703(F), that Landrigan was previously convicted of a felony involving the use or threat of violence on another person; and that he committed the offense in expectation of receiving something of pecuniary value. The judge found no statutory mitigating circumstances sufficient to call for leniency, but she identified family love and lack of premeditation as non-statutory

_____

[3]  Smith testified that Landrigan said: "I did it with my hands. Me and another dude. I just beat 'em, you know what I mean? . . . And he killed him. They ain't got him. He disappeared. . . . Well, like I said all I did was knock him out, the other guy killed him."

-3-

mitigating circumstances. On balance, the sentencing judge concluded, the mitigating factors did not outweigh the aggravating circumstances. Accordingly, Landrigan was sentenced to an aggravated term of 20 years on the burglary count, six months in county jail for theft, and death for murder.

In the course of rendering her decision, the sentencing judge found from the evidence at trial and at sentencing that Landrigan "was the actual killer, that he intended to kill the victim and was a major participant in the act. Although the evidence shows that another person may have been present, the Court finds that the blood spatters on the tennis shoes of the defendant demonstrate that he was the killer in this case."

The Arizona Supreme Court affirmed Landrigan's conviction and sentence on direct appeal. *Landrigan,* 859 P.2d at 114, 117-18. After post-conviction relief proceedings in state court, Landrigan filed a petition for writ of habeas corpus in federal district court on October 16, 1996. The petition focused on claims of ineffective assistance at sentencing. Ultimately, the United States Supreme Court reversed this court's grant of an evidentiary hearing. *Schriro v. Landrigan,* 550 U.S. 465 (2007), *rev'g* 441 F.3d 638 (9th Cir. 2006) (en banc).

Meanwhile, an Arizona statute was enacted in 2000 that provided for post-

-4-

conviction DNA testing.[4] In the wake of that statute, an investigator with the office of the Federal Public Defender for the District of Arizona contacted the Phoenix Police Department to determine whether hair found on or in Dyer's hand, and a fingernail found in his apartment, still existed. The Police Department couldn't find them. In the summer of 2006, Landrigan sought an order from the Maricopa County Superior Court authorizing him to conduct post-conviction DNA testing on the fingernail and hairs. Although the state indicated that this evidence was available, and an order was issued, on January 29, 2007 the Phoenix Police Department again said it couldn't find the fingernail or hairs.

On August 6, 2007, Landrigan asked the superior court to expand its 2006 DNA testing order to include Dyer's jeans, the blanket from his bed, and a set of two curtains from his apartment. The court did so. The jeans, blanket, and curtains were sent to Technical Associates Inc. (TAI), a Ventura, California laboratory, for testing. TAI reported on April 22, 2008 that Landrigan was excluded as a contributor of any of the DNA. Landrigan asked for an evidentiary

---

[4] Ariz. Rev. Stat. § 13-4240(A) provides for post-conviction testing of "any evidence that is in the possession or control of the court or the state, that is related to the investigation or prosecution that resulted in the judgment of conviction, and that may contain biological evidence." Before seeking DNA testing under this statute, the prisoner must demonstrate to the court that the evidence still exists. *Id.* § 13-4240(B)(2).

hearing which the superior court denied (August 7, 2009) on the footing that there was no dispute about the findings for an evidentiary hearing to resolve.

On August 10, 2009 Landrigan sought to amend his post-conviction review petition to assert that the results of the DNA testing showed that the sentencing judge erroneously concluded he was eligible for the death penalty under *Enmund v. Florida*, 458 U.S. 782, 797 (1982). The superior court dismissed this petition (October 5, 2009), finding that the DNA evidence would not have affected the trial court's sentence of death. It found that at most, the new DNA evidence shows only that someone else may have been involved in the crimes. The court also noted that Landrigan told his psychological expert that he put the victim in a headlock while his accomplice hit him. Further, both the trial judge and the Arizona Supreme Court determined that the record did not present mitigating evidence sufficiently substantial to call for leniency. Finally, the court observed that if an accomplice were involved in the murder, Landrigan knew it and could have presented this fact, or his lesser culpability, as mitigation. The superior court denied rehearing. The Arizona Supreme Court declined review, and the United States Supreme Court declined to issue a writ of certiorari. *Landrigan v. Arizona*, No. 10-5280, 2010 WL 2717732 (U.S. Oct. 4, 2010).

While TAI performed tests on blood stains on the jeans, it did not subject

-6-

them to DNA analysis. At Landigran's request, the superior court on October 10, 2010 released the jeans for TAI to complete the testing ordered in 2007. Preliminary results furnished on October 20, 2010 show that the semen and blood left on both the jeans and the blanket are the victim's or someone else's, not Landrigan's.

After some procedural back and forth, the Arizona Supreme Court refused to stay the execution on account of the new DNA test results. In the midst of that court's consideration of the issue, Landrigan filed the application for leave to file an SOS petition that we now consider. In the application, Landrigan asserts that the DNA evidence supports a claim for habeas relief in that it clearly shows he is not eligible for the death penalty under *Enmund* and *Tison v. Arizona*, 481 U.S. 137, 158 (1987). The petition he wishes to file in district court seeks a writ of habeas corpus as to the death sentence and an order that the Arizona courts conduct whatever proceedings are necessary to comply with *Enmund* and *Tison*.

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), we may only authorize the filing of an SOS application if the applicant makes a prima facie showing that "the facts underlying the claim, if proven and viewed in light of the evidence as a whole, would be sufficient to establish by clear and convincing evidence that, but for constitutional error, no reasonable factfinder

-7-

would have found the applicant guilty of the underlying offense." 28 U.S.C. § 2244(b)(2)(B)(ii).[5] In addition, the applicant must show that the factual predicate for the claim could not have been discovered previously through the exercise of due diligence. *Id.* § 2244(b)(2)(B)(i).

On diligence, we note that Landrigan was convicted in June 1990. The Arizona DNA-testing statute was adopted in 2000, but Landigran did not seek DNA testing until 2006. Even then, testing was sought only as to the hair and a fingernail. It was not until 2007, when the Police Department finally said it didn't have this evidence, that Landrigan asked for DNA testing on Dyer's jeans, blanket, and curtains. Landrigan offers no explanation for waiting six years after the Arizona DNA statute was enacted to seek DNA testing of any sort. Nor does any explanation appear for why he did not ask for DNA testing on the jeans, blanket, or curtains in 2006 when he asked for it on the hair and fingernail. In these circumstances a serious question exists whether the factual predicate for the claim – results of DNA testing on the jeans – could not have been discovered earlier.

---

[5] The state suggests that only a conviction may be challenged under § 2244(b), as the statute pertains to the "underlying offense." However, we have treated a claim that a petitioner is ineligible for the death penal as covered. *See Thompson v. Calderon*, 151 F.3d 918, 923-24 (9th Cir. 1998) (en banc). Regardless, the outcome in this case is the same, given our conclusion that no adequate showing of a constitutional violation has been made.

But assuming diligence, Landrigan must make a prima facie showing[6] of ineligibility for the death penalty under *Enmund* and *Tison*. He submits that he has done so by showing that he was not the actual killer or a major participant because he is excluded as a source of the DNA found on the victim's curtains, blanket, and jeans.

In *Enmund*, a couple was robbed and fatally shot by Sampson and Jeanette Armstrong. Enmund was in the get-away car, not at the house where the murders occurred. He, along with the Armstrongs, was convicted of first-degree murder and robbery. The Court held that the death penalty may not constitutionally be imposed on one who aids and abets a felony (such as robbery) in the course of which a murder is committed by someone else when he did "not himself kill, attempt to kill, or intend that a killing take place or that lethal force will be employed." 458 U.S. at 797. *Tison* involved two individuals whose participation was neither as killer, nor as someone who wasn't on the scene and didn't intend or

---

[6] A "prima facie showing" is "'a sufficient showing of possible merit to warrant a fuller exploration by the district court,'" and we will grant an application for an SOS petition if "'it appears reasonably likely that the application satisfies the stringent requirements for the filing of a second or successive petition.'" *Woratzeck v. Stewart*, 118 F.3d 648, 650 (9th Cir. 1997) (*per curiam*) (quoting *Bennett v. United States*, 119 F.3d 468, 469 (7th Cir. 1997)); *Cooper v. Woodford*, 358 F.3d 1117, 1119 (9th Cir. 2004) (en banc) (quoting *Woratzeck*, 118 F.3d at 650)).

-9-

plan to kill as in *Enmund*. Rather, they armed the actual killers knowing they had previously killed others, they were present and stood by and watched their companions shoot and kill the victims, and could have foreseen that lethal force might be used. Thus, they were not minor participants and their mental state was one of reckless indifference to the value of human life. In these circumstances, the Court concluded, the *Enmund* culpability requirement could be met.

We disagree that the DNA test results make a prima facie showing of a constitutional violation under *Enmund* and *Tison*. Together *Enmund* and *Tison* indicate that major participation in the felony, together with reckless indifference to human life, suffices for death penalty eligibility. Here, the sentencing judge found that Landrigan was the actual killer, that he intended to kill Dyer, and that he was a major participant in the act – in other words, the *Enmund/Tison* culpability requirements were met. Landrigan maintains that the sentencing judge's finding clearly lacks support in the evidence in light of the DNA test results, but these results simply show that Landrigan did not contribute semen or blood found on Dyer's jeans. They do not show that Landrigan was not, at a minimum, a major participant in Dyer's death. Landrigan further suggests that the results demonstrate the sentencing judge's "folly in believing the testimony of Cheryl Smith," but whether part, all, or none of her testimony was credible, Landrigan confessed to his

-10-

psychologist that he "put the victim in a head lock, and his partner hit him until he was unconscious. The client [Landrigan] went back to robbing the place, his original intention, while the partner took an electric cord and began to choke him to death." Thus, Landrigan was present at the scene (unlike Enmund), and he has admitted facts that demonstrate his major participation in, and reckless indifference to, Dyer's murder.

We conclude that Landrigan's second and successive habeas application presents no substantial ground on which relief might be granted. Our review of the record convinces us that further exploration by the district court is unwarranted. Accordingly, we deny his application. This moots the request for a stay.[7]

APPLICATION DENIED. REQUEST FOR STAY DISMISSED.

---

[7] Our denial "shall not be appealable and shall not be the subject of a petition for rehearing or for a writ of certiorari." 28 U.S.C. § 2244(b)(3)(E).

-11-

Landrigan v. Brewer, No. 10-99021

Chief Judge **KOZINSKI**, with whom Judges **O'SCANNLAIN, McKEOWN, GOULD, TALLMAN, BYBEE, CALLAHAN** and **BEA** join, dissenting from the denial of rehearing en banc:

The Supreme Court has instructed us that an injunction is an "extraordinary and drastic remedy," Munaf v. Geren, 553 U.S. 674, 689 (2008), and we should be particularly hesitant to grant such relief where, as here, our stay of execution will trample on the state court's judgment, see Baze v. Rees, 553 U.S. 35, 51 n.2 (2008) (plurality opinion) (instructing courts to give a "measure of deference to a State's choice of execution procedures"); cf. also Ohio Civil Rights Comm'n v. Dayton Christian Schs., Inc., 477 U.S. 619, 627 (1986) ("Because of our concerns for comity and federalism, we thought that it was 'perfectly natural for our cases to repeat time and time again that the normal thing to do . . . is not to issue such injunctions.'" (quoting Younger v. Harris, 401 U.S. 37, 45 (1971))). Given these concerns, a court lacks discretion to issue an injunction unless the plaintiff shows that (1) "he is likely to succeed on the merits," (2) "he is likely to suffer irreparable harm in the absence of preliminary relief," (3) "the balance of equities tips in his favor," and (4) "an injunction is in the public interest." Winter v. Natural Res. Def. Council, 129 S. Ct. 365, 374 (2008).

Thus, "like any other stay applicants, inmates seeking time to challenge the manner in which the State plans to execute them must satisfy all of the requirements for a stay, including a showing of a significant possibility of success on the merits." Hill v. McDonough, 547 U.S. 573, 584 (2006). Moreover, a "preliminary injunction [for a stay of execution is] not granted unless the movant, by a clear showing, carries the burden of persuasion." Id. (citing Mazurek v. Armstrong, 520 U.S. 968, 972 (1997) (per curiam)). Accordingly, to justify a preliminary injunction in this case, Landrigan would have to make a clear showing of a likelihood of success on his claim that Arizona's three-drug protocol is "sure or very likely to cause . . . needless suffering" in violation of the Eighth Amendment. Helling v. McKinney, 509 U.S. 25, 33 (1993); see also Cooper v. Rimmer, 379 F.3d 1029, 1033 (9th Cir. 2004). This he has utterly failed to do.

Yet the panel affirms the district court's preliminary injunction on the basis that the state never gave the panel the information about its lethal injection drugs that it provided to the district court. Landrigan v. Brewer, No. 10-99021, Order at 8 (9th Cir. Oct. 26, 2010). But the state was required to provide no such information—to us or the district court—because Landrigan did not show even a possibility that he faces "a demonstrated risk of severe pain" during the scheduled execution. Baze, 553 U.S. at 61. Under the standard adopted by the Supreme

Court in <u>Baze</u>, the district court abused its discretion in imposing a stay.

The fulcrum of Landrigan's Eighth Amendment claim is that the sodium thiopental that the state plans to use during his execution has been obtained from foreign sources that do not have FDA approval. <u>Landrigan</u>, No. 10-99021, Order at 1–2. Landrigan made two separate claims as to how this deficiency might harm him:

(1)  The drug might be insufficiently potent, and thus fail to knock him unconscious, which would subject him to excruciating pain from the administration of the second and third drugs in the three-drug protocol.

(2)  Administration of the sodium thiopental itself might cause Landrigan severe pain because it "could be contaminated with toxins."

<u>Landrigan</u> v. <u>Brewer</u>, No. CV-10-02246 (ROS), Order Granting Mot. for a TRO at 8–9 (D. Ariz. Oct. 25, 2010) ("District Court Order").

As to claim (1), the state pointed out in the district court that, as part of the execution protocol, Arizona maintains stringent safeguards to ensure that the prisoner is in fact unconscious at the time the second and third drugs are administered. These safeguards go far beyond those adopted in other states, such as California, and include the use of a microphone, a high resolution camera and physical inspection by medically trained personnel. <u>Compare</u> <u>Baze</u>, 553 U.S. at 120–21 (Ginsburg, J., dissenting) (describing California's procedures), <u>with</u>

Dickens v. Brewer, No. CV07-1770 (NVW), 2009 WL 1904294, at *20 (D. Ariz. July 1, 2009) (discussing Arizona's protocols and concluding that Arizona "provides more safeguards than does the [protocol at issue in Baze] against the risk that the sodium thiopental will be improperly administered").

Significantly, the district court accepted the state's argument and assumed in its order that Landrigan would be rendered unconscious by the non-FDA approved sodium thiopental. In footnote 5 of its order, it explained as follows:

> Defendants have repeatedly misconstrued this issue. Defendants stress that Arizona's protocol ensures that pancuronium bromide and potassium chloride will be administered only to an unconscious prisoner. While the protocol does offer safeguards in the event that inferior sodium thiopental fails to properly anesthetize Plaintiff, those safeguards do nothing to prevent the risk of harm from contaminants or a counterfeit product. A core portion of Plaintiff's claim—a portion Defendants choose to ignore—is that there may be a substantial risk of serious harm due to the administration of the sodium thiopental itself.

District Court Order at 10 n.5 (emphasis added). The district court's order thus hinges entirely on Landrigan's claim that he might suffer severe pain from the administration of the sodium thiopental. But on that score, Landrigan has simply not carried his burden. While he makes a claim in his papers that this is possible, that claim is supported by three documents, none of which help his case.

The first document, the declaration of Dr. Palmer, says absolutely nothing

about the risk of pain from the administration of the sodium thiopental itself. <u>See</u> District Court Order at 9. Dr. Palmer gives an example of a foreign drug that had been adulterated and caused harm to patients, but no example at all that caused instant, excruciating pain—or any pain at all. Also notably absent from Dr. Palmer's declaration is any statement that the nature or composition of sodium thiopental is such that there is any substantial risk of harm and pain in connection with its use here. Dr. Palmer makes no reference to "the literature" containing any mention of contaminants or toxins. In short, there is no evidence of toxicity of the non-FDA approved sodium thiopental that could conceivably cause Landrigan pain on injection.

The second and third documents are statements by the FDA that foreign drugs may be counterfeit or of unknown quality, but neither document suggests that such drugs cause severe pain. <u>Id.</u> Nor is there any mention of sodium thiopental in particular. Landrigan's and the district court's speculation that the drug Arizona plans to use could cause pain is supported by nothing whatsoever. This lack of evidence in the record is particularly unforgivable given that Landrigan knew about the national shortage of sodium thiopental for over five months, but waited until the eleventh hour to assert his claim. <u>See</u> <u>Nelson</u> v. <u>Campbell</u>, 541 U.S. 637, 650 (2004) ("Given the State's significant interest in

enforcing its criminal judgments, there is a strong equitable presumption against the grant of a stay where a claim could have been brought at such a time as to allow consideration of the merits without requiring entry of a stay." (internal citations omitted)).

I thus don't see what necessity there was for the state to present <u>any</u> evidence to rebut Landrigan's nonexistent showing. As to risk (1), the state showed that it has a protocol that ensures the prisoner is unconscious before the otherwise painful second and third drugs are administered. The district court did not find this protocol deficient, nor could it. As to risk (2), Landrigan has not shown any more than a speculative possibility that he will suffer pain during the execution.

Because Landrigan did not meet his burden, the state had no duty to come forward with any information. Indeed, Arizona had good reasons not to; just twenty-four hours after the state attorney general conceded that the drug was imported from Great Britain, one journalist suggested the company might be criminally liable under an EU regulation that makes it illegal to "trade in certain goods which could be used for capital punishment, torture, or other cruel, inhuman or degrading treatment." <u>See</u> Clive S. Smith, <u>The British Company Making a Business out of Killing</u>, The Guardian (Oct. 26, 2010, 4:00 p.m.),

http://www.guardian.co.uk/commentisfree/cifamerica/2010/oct/26/jeffrey-landrigan-execution-sodium-thiopental. Certainly Arizona has a legitimate interest in avoiding a public attack on its private drug manufacturing sources, particularly when Hospira—the only source of sodium thiopental within the United States—hasn't yet announced when the drug will actually be available for executions or how much it plans to produce. Although the district court may have been annoyed with the state for failing to provide the information Landrigan's lawyers wanted to see, the fact remains that Landrigan was not entitled to the information because he failed to make a threshold showing that he will suffer harm.

It is not warranted for the district court or our three-judge panel to give primacy in Eighth Amendment analysis to a distinction between a drug manufactured by a domestic company, and approved by the FDA, and the same drug made by a manufacturer located in a foreign country. No evidence has been presented by Landrigan that the foreign manufacturer makes the drug in a way that would add toxins or would not satisfy its intended purpose.

Landrigan also seems to argue that he needs the information he requested in order to make out a claim in the first place. But there is no authority for the proposition that a prisoner is entitled to a stay in order to get discovery to make out

a claim. See Hill, 547 U.S. at 584 (observing that "a number of federal courts have invoked their equitable powers to dismiss suits they saw as speculative or filed too late in the day" when sustaining the suit would require a stay of execution). Rather, he must come forward with evidence that he may suffer serious harm before the state need provide any such information. Landrigan has offered nothing at all.

*       *       *

Federal courts are not "boards of inquiry charged with determining 'best practices' for executions." Baze, 553 U.S. at 51. Nor should the plaintiff's conclusory allegations kick off a mini-trial on drug certification and importation. We may only stop an execution if plaintiff has met the standard for injunctive relief, including making out a strong case of likelihood of success on the merits. The panel in this case made an egregious error by affirming the district court's stay of Landrigan's execution with no showing of an Eighth Amendment violation. This error is serious, and, if left uncorrected, likely to be repeated by future panels who do not respect "the State's legitimate interest in carrying out a sentence of death in a timely manner." Baze, 553 U.S. at 61.

The Supreme Court told us in Baze that "to prevail on [an Eighth

Amendment] claim there must be a 'substantial risk of serious harm,' an 'objectively intolerable risk of harm.'" Id. at 50. But Landrigan's sheer speculation that he might suffer from a contaminated or unapproved dose of sodium thiopental obtained from outside the United States comes nowhere near meeting his burden to "establish that such exposure . . . present[s] the risk [which] must be 'sure or very likely to cause serious illness and needless suffering,' and give rise to 'sufficiently imminent dangers.'" Id. at 49–50. Instead, by countenancing such untimely hypothetical arguments, we are simply encouraging collateral litigation that is embroiling us in scientific controversies beyond our expertise, and intruding on legislative and executive prerogative in providing for humane manners of execution. See id. at 51. In the process we are promoting new obstacles to prevent states from carrying out legitimate judgments and losing sight of our overarching responsibility to see that justice is done. Because I believe the panel disregards both the state's legitimate interests and Supreme Court precedent, I must dissent from our failure to grant rehearing en banc.